**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 17-62010-CIV-ALTMAN/Reid**

**DARYL GERMAN**,

      *Plaintiff*,

v.

**MARK S. INCH**,

      *Defendant*.

_____/

**<u>ORDER</u>**

Before the Hon. Roy K. Altman:

The Petitioner, Daryl German ("German"), killed a man and stole his drugs. A state jury convicted him of armed robbery and felony-murder, and a state judge sentenced him to prison for the rest of his life. After years of appeals and collateral attacks, he filed this *pro se* petition under 28 U.S.C. § 2254 for a writ of habeas corpus (the "Petition") [ECF No. 1].[1]

This Court referred the Petition to United States Magistrate Judge Lisette M. Reid who recommended that German's Petition be denied. *See* Report and Recommendation (the "Report") [ECF No. 19]. German filed timely objections to certain portions of Judge Reid's Report

---

[1] The Defendant, Mark S. Inch, filed a Response, in which he urged the Court to deny the Petition. *See* Response [ECF No. 11].

1

("Objections") [ECF No. 20], which this Court reviews *de novo*. *See* FED. R. CIV. P. 72(b)(3). The rest of the Report this Court inspects only for clear error. *Id.*

## THE FACTS

German was indicted—along with two co-defendants, Brenda Babrow and Eric Anderson—on charges of First-Degree Murder and Armed Robbery with a Firearm. *See* Indictment [ECF No. 12-1] at 14. German moved for—and received—a severance. *See* German's Memorandum of Law (the "Memo") [ECF No. 5] at 18.

Before trial, German moved to suppress the statement he gave to Detectives Chris Murray and James Carr. *See* Pretrial and Trial Transcript (the "Transcript") [ECF No. 13-1] at 36. The state court held a suppression hearing, at which Detective Murray testified that (1) he read German his *Miranda* rights; (2) German voluntarily signed a *Miranda* waiver form; and (3) German agreed to speak with the Detectives without a lawyer. *Id.* at 39, 46, 47. As relevant here, the *Miranda* waiver form German signed—which was introduced into evidence—informed German that he had (among others) the right to an attorney, the right to remain silent, and the right to stop questioning at any time. *Id.* at 42–46. German signed the form in the Detectives' presence and thereby affirmed that he was knowingly and voluntarily waiving his *Miranda* rights. *Id.* at 46.

When the Detectives asked German if he would mind having the interview recorded, he demurred. *Id.* at 47. Although Detective Murray admitted that, given the passage of two years, he did not remember precisely what German had said, he told the court that he had taken down some notes during the interview—and that his secretary ("Denise") had typed them into a report. *Id.* at

2

51, 63. The court then allowed Detective Murray to read from Denise's report of his notes, *id*. at 51–57, after which the court took a two-month recess, *id.* at 69.

When the hearing resumed, German testified that he did not remember signing the *Miranda* waiver. *Id*. at 102. Nevertheless, German conceded both that the police had read him the rights set out in that form and that his signature was at the bottom. *Id*. at 102:14 ("[L]ike I said, it's my signature."). According to German, he told the Detectives that he would not sign the form. *Id.* at 102. At that point, he claimed, Deputy Carr "started getting, like violent, hitting on the table and stuff and Deputy Murray – Deputy Murray calmed him down." *Id.* at 104:24–05:2. According to German, the Detectives told him that he could "save himself," and that "[Detective Murray] started talking about that, oh he said he could talk to the judge because he knows that Eric [the co-defendant] was lying. He said he could get me five or seven years" if "I talked to them." *Id.* at 105–06. The Detectives allowed German to speak with his grandmother—who asked him to cooperate—but German still refused to talk. *Id.* at 107.

Eventually, though, "[German] was scared and [] thought that if [he could] take them to a place where a gun is, then [he] could get out of this building and [the officers] could take [him] to a county jail. [He] took them." *Id.* at 108–09. So, German led the Detectives to Babrow's house, where he pointed out the canal—which ran behind the house—into which he had tossed the gun. *Id*. at 112.

Noting both that German signed the waiver form after the Detectives read it to him *and* that he had been arrested on fifteen prior occasions—and thus was likely familiar with both the form's contents and his rights—the court denied German's motion to suppress. *Id.* at 131.

3

German's trial began on July 26, 1995. *See* Transcript at 134. The court brought in a venire panel of fifty jurors. *See* Pet. at 19. German's lawyer exercised only nine of the ten peremptory strikes he was allotted—even though the court gave him an extra opportunity to use one more. *Id.*

In its case-in-chief, the State called Don Allie, the victim's neighbor, who testified that, on the night of the murder, he saw the victim standing outside of his apartment with what appeared to be a large blood stain in the front and center of his shirt. *See* Transcript at 163–70. Allie added that he heard the victim tell Ann—another neighbor—that two black males and a redheaded girl had attacked him. *Id.* at 166. According to Allie, the victim said that the redheaded girl had come to the door first. *Id.* When the victim opened the door, the victim's story went, the two men rushed in. *Id.* The State also called Antoinette Neal—a third neighbor—who corroborated Allie's account that the girl, in the victim's recollection, had red hair. *Id.* at 228.

The State also brought in a medical examiner, a crime scene investigator, and a firearms expert—whose collective testimony established that the victim died of a bullet wound to his abdomen from a .38 caliber weapon. *Id.* at 262, 280, 326. The State then called the first deputy to reach the scene and a paramedic—both of whom spoke with the victim and relayed a similar story to the one Allie and Neal had told: that a red-headed woman had knocked on the victim's door; that two black men had rushed him as soon as he opened the door; that the men held him at gunpoint; that they ordered him to open the safe; and that, when he refused, they beat him and shot him once in the stomach. *Id.* at 405, 414.

Finally, the State called Detective Chris Murray. *Id.* at 420. As it had done at the suppression hearing, the court allowed Detective Murray to read from Denise's report of his interview notes—though, citing the contours of Florida's recorded-recollection exception to the

4

hearsay rule, FLA. STAT. § 80.803(5), the court did not allow the State to introduce the report itself into evidence, *id* at 485–518. With help from Denise's report, Detective Murray testified that German had confessed to planning and committing the robbery. *Id.* at 533–35. According to Detective Murray's recollection, German had selected the victim because he (the victim) had "drugs and money in his apartment." *Id.* at 533–35. As Detective Murray recalled things, German admitted that his co-defendant had pistol-whipped the victim during the robbery because the victim had refused to open the safe. *Id*. at 535. And—German told Detective Murray—when the victim went for German's gun, his co-defendant took the gun, pistol-whipped the victim again, and shot the victim in the stomach. *Id*. at 535–37. As Detective Murray remembered the conversation, German said that, with the victim down, he (German) took the victim's drugs and money and, after fleeing, tossed the gun into a canal behind Babrow's house. *Id*. at 537.

German called no witnesses. *Id.* at 624.

Before closing arguments, German moved for a judgement of acquittal. *Id.* at 631–43. In this motion, German's trial counsel argued that—aside from the alleged confession—the State had presented no evidence tying German to the crime. *Id*. And, turning to that confession, trial counsel asked the court not to consider it because—he said—it had been involuntarily coerced. *Id*. Counsel also contended that German could not be guilty as a principal—or, at least, that the State had failed to carry its burden that he could be—because "the intent necessary to convict a person of guilty [sic] of a crime committed by another is specific intent to participate in criminal acts of the actual perpetrator with respect to the crime under consideration." *Id*. at 639. The State countered that "a reasonable mind could differ"—and, therefore, that the question of German's intent should go to the jury. *Id*. at 642. The Court denied the motion. *Id*. at 643.

After the State's closing argument, German reversed course and told the court that he wanted to testify. *Id.* at 737. His lawyer conceded that German had likely waived his right to testify—and that, even if he had not, the lawyer had advised him against it. *Id.* The Court warned German that he would be cross-examined, *id.* at 738–39, and added: "Now, let me say one other thing that the defendant should consider. Your attorney has made an excellent closing argument. It is conceivable that the jury has a reasonable doubt; and by your testifying, that you are going to eliminate that doubt," *id.* at 740:13–18. When German insisted, the court agreed to allow him to testify. *Id.* at 743.

But, when the jury returned from a short recess, German had changed his mind again: now, he said, he wished to remain silent. *Id.* at 749. The court allowed German to discuss the decision further with his lawyer—after which German told the court that he had decided not to testify after all, that remaining silent was "without question . . . the correct decision," and that he fully understood his lawyer's advice. *Id.* The court warned German that, "if you want the trier of fact to know something, the only way you can do that is by testifying." *Id.* at 750:19–21. Despite this admonition, German reiterated his decision not to testify. *Id.* at 751. German's lawyer then gave the second half of his bifurcated closing argument. *Id.* at 756.[2]

After closings, the court instructed the jury on the elements of first-degree murder and its lesser-included offenses: second-degree murder with a firearm; second-degree murder; third-degree murder with a firearm; third-degree murder; and manslaughter. *Id.* at 772, 774–75, 777. The court also gave the jury an instruction on excusable (or justifiable) murder. *Id.* at 773. Turning

---

[2] Because German's lawyer elected to bifurcate his closing argument, he was permitted to argue *both* before, Transcript at 693, and after the prosecution, *id.* at 756.

to the elements of robbery, *id.* at 779, the court explained the principle of principal liability like this: "If all the elements of the charge have been proved, if one or more persons helped each other to commit or attempt to commit a crime, and the defendant is one of them, the defendant must be treated as if he had done all the things the other person or persons did." *Id.* at 785:9–13. Finally, the court told the jurors that their verdict—whatever it was—had to be unanimous. *Id.* at 790.

After two days of deliberations, the jury found German, as to Count I, guilty of the lesser-included offense of second-degree murder with a firearm and, as to Count II, guilty (as charged) of robbery with a firearm. *Id.* at 856. The court sentenced German to two consecutive terms of life in prison—one for each count. *See* Sentencing Form [ECF No. 12-1] at 29–38.

## THE HISTORY

This Petition is the latest in a long string of direct and collateral appeals German has filed at both the state and federal levels. The saga began in 1997,[3] when German—through counsel—appealed his conviction and sentence, arguing that the trial court erred by: (1) allotting him only nine peremptory challenges; (2) failing to address a jury question during deliberations; (3) erroneously admitting hearsay testimony; (4) discussing his co-defendants—who had been severed from his trial—in his jury instructions; and (5) denying his motion for acquittal.[4] *See* Direct Appeal Opening Brief [ECF No. 12-1] at 46. The Fourth District Court of Appeal ("Fourth DCA")

---

[3] That's right. There was a two-year delay between German's conviction and his appeal—in large measure because the court reporter neglected to file the trial transcripts for a full calendar year after the trial had finished. *See* Fourth District Court of Appeal, Case No. 4D95-3226 [ECF No. 12-1] at 41–44. It was not until after the Fourth District Court of Appeal threatened to sanction the court reporter that she finally got it done. *Id.* at 42. German delayed the process further by requesting (and receiving) three extensions of time to file his initial brief. *Id.* at 41–44.

[4] In appealing the denial of his motion for acquittal, German contended only that the evidence was insufficient to sustain his conviction. *See* Direct Appeal Opening Brief [ECF No. 12-1] at 73.

affirmed German's conviction and sentence. *See German v. State*, 701 So.2d 881 (Fla. 4th DCA 1997). And his direct appeal became final on November 7, 1997. *See* Fourth DCA Mandate [ECF No. 12-1] at 105.

Four years later, in 2001, German—now *pro se*—filed his *first* Rule 3.850 motion to vacate his conviction and sentence. *See* 2001 Rule 3.850 Motion [ECF No. 12-1] at 107. In this first attempt at collateral review, German argued that his trial counsel had been ineffective because he: (1) did not use all of his preemptory challenges and did not ask for more; (2) threatened to abandon German if he elected to testify; and (3) failed to object to the jury instruction in which the judge told the jurors that their verdict, whatever it was, had to be unanimous. *Id.* The state trial court adopted the State's Response as its opinion and denied the motion on the merits. *See* Order Denying 2001 3.850 Motion [ECF No. 12-1] at 203. And the Fourth DCA promptly affirmed. *See German v. State*, 812 So.2d 424 (Fla. 4th DCA 2002).

In 2004, German filed his *second* Rule 3.850 motion. In this second collateral attack, German said that he had discovered some "new" evidence—evidence which, he insisted, could have been used to impeach the "lead" detective, James Carr. 2004 Rule 3.850 Motion [ECF No. 12-1] at 211. This second 3.850 motion also contended that the trial court had erred by admitting into evidence Denise's transcription of Detective Murray's police report. *Id.* The state trial court rejected both arguments. Starting with the first, the court determined that the evidence was not "newly discovered" because German had waited more than two years[5] from the date on which he

---

[5] Two years is the applicable statute of limitations under Rule 3.850 for newly discovered evidence. *See* Fla. R. Crim. P. 3.850(b) ("No motion shall be filed or considered pursuant to this rule if filed more than 2 years after the judgment and sentence become final unless it alleges that (1) the claim

discovered the evidence before filing his motion. Order Denying 2004 Rule 3.850 Motion [ECF No. 12-1] at 254. As for the second, the court concluded that the claim was time-barred and—in any event—successive. *Id*. Again, the Fourth DCA affirmed. *See German v. State*, 914 So.2d 972 (Fla. 4th DCA 2005).

In 2006, German filed his *first* state habeas petition before the Fourth DCA. In it, he maintained that the trial court had erred by instructing the jury that depraved-mind second-degree murder was a lesser-included offense of first-degree murder. *See* 2006 State Habeas Petition [ECF No. 12-2] at 2. The Fourth DCA denied this petition. *See* Order Denying 2006 State Habeas Petition [ECF No. 12-2] at 34.

Later that same year, German filed his *first* federal habeas petition under 28 U.S.C. § 2254 in this Court. *See* 2006 Federal Habeas Petition [ECF No. 12-2] at 36. Noting that his conviction became final in 1997—and that the Antiterror and Effective Death Penalty Act's[6] one-year window thus closed in 1998—this Court denied that petition as untimely. *See* Order Denying 2006 Federal Habeas Petition [ECF No. 12-2] at 161. Both the Eleventh Circuit and the Supreme Court denied German's requests for further review. *See* Eleventh Circuit Order Denying Certificate of Appealability [ECF No. 12-2] at 168; Letter from Supreme Court Clerk [ECF No. 12-2] at 214.

Having thus failed in federal court, in 2008, German returned to state court and filed his *first* motion to correct his sentence under Rule 3.800. *See* 2008 Rule 3.800 Motion [ECF No. 12-2] at 217. The trial court denied this motion, and the Fourth DCA affirmed. *See* Order Denying

---

is made within 2 years of the time the new facts were or could have been discovered with the exercise of due diligence[.]").
[6] *See* AEDPA, 28 U.S.C. § 2244(d)(1).

2008 Rule 3.800 Motion [ECF No. 12-2] at 237; Fourth DCA Mandate [ECF No. 12-2] at 241. German filed similar state habeas petitions in 2011 (his *second*) and 2012 (*third*)—both of which the Fourth DCA promptly denied. *See* Order Denying 2011 Petition [ECF No. 12-3] at 61; Order Denying 2012 Petition [ECF No. 12-3] at 84. And his appeals of those decisions to the Florida Supreme Court were likewise unavailing. *See* Order Denying Review of 2011 Petition [ECF No. 12-3] at 65; Order Denying Review of 2012 Petition [ECF No 12-3] at 89. In 2012, the Fourth DCA warned German that, if he continued to file motions for post-conviction relief, he would be sanctioned. *See* Order Denying 2012 Petition [ECF No. 12-3] at 84.

Undaunted, in March of 2012, German brought his *second* motion under Rule 3.800. In this one, German claimed that the trial court had calculated his sentence incorrectly. *See* 2012 Rule 3.800 Motion [ECF No. 12-3] at 91. This time, the trial court *granted* German's motion after finding that the trial judge had miscalculated German's guidelines range. *See* Order Granting 2012 Rule 3.800 Motion [ECF No. 12-3] at 138. As redress, the court ordered that German be resentenced. *Id*. After some tortuous procedural hiccups,[7] the trial court resentenced German on the murder charge and reduced his life sentence to 40 years. *See* 2016 Resentencing Documents [ECF No. 12-3] at 258–67. But the court refused to reduce the second life sentence German had received for the armed robbery conviction.[8] *Id*. After this resentencing (2016), German brought

---

[7] Two years after granting German's motion, the trial court reversed itself and vacated (and then denied) its order to resentence. *Id*. at 179, 202. But, noting that the State had waited more than two years to file its motion to vacate the resentencing order, the Fourth DCA (wait for it) vacated the trial court's order vacating the original resentencing order. *See* Order Vacating and Reinstating Resentencing Order [ECF No. 12-3] at 251.

[8] During the four years in which his 2012 Rule 3.800 motion was pending, German brought a *second* federal habeas petition, *see* 2014 Federal Habeas Petition [ECF No. 12-3] at 269, which

10

his *third* Rule 3.850 motion, which the trial court denied. *See* 2016 Rule 3.850 Motion [ECF No. 12-4] at 6. Again, the Fourth DCA affirmed. *See* Report at 6.

The following year (2017), German filed this Petition. In total, then, German has had a jury trial and two sentencings; he has taken a direct appeal; and he has filed three Rule 3.850 motions (2001, 2004, 2016), three state habeas petitions (2006, 2011, 2012), two Rule 3.800 motions (2009 and 2012), and three federal habeas petitions (2006, 2014, 2017). He has lost at every level—and he will lose here, too.

## THE OBJECTIONS

German's Petition lobs fifteen claims against almost every facet of his underlying criminal conviction. In Claim One, German argues that his trial counsel was ineffective for failing to object to "the trial court's imposition of multiple punishments for the same offense." Pet at 7. In Claim Two, German says that the trial court erred both by denying him a hearing and by using an "inadequate procedure" for determining the date on which his "newly discovered evidence" became available. *Id*. at 10. In Claims Three and Four, German alleges that his trial counsel was ineffective for failing to depose or call two witnesses: Detective James Carr and Denise. *Id*. at 12, 15. In Claim Five, German avers that the trial court erred by allowing Denise's transcribed notes into evidence. *Id*. at 17. In Claim Six, German contends that the trial court violated the Confrontation Clause by admitting certain hearsay statements. *Id*. at 18. In Claim Seven, German asserts that his trial counsel was ineffective for failing to use all ten of his peremptory challenges. *Id*. at 19. In Claim Eight, German criticizes the trial court for including the names of his co-

---

this Court denied as successive, *see* Order Denying 2014 Federal Habeas Petition [ECF No. 12-4] at 2.

defendants—who were not on trial—in the jury instructions. *Id.* at 20. In Claim Nine, German submits that his trial counsel was ineffective for threatening to abandon him if he testified. *Id.* at 22. In Claim Ten, German insists that the trial court "violated [his] right to due process when it imposed an increased sentence based upon judicial vindictiveness." *Id.* at 24. In Claim Eleven, German says that the *Miranda* warnings he received were inadequate. *Id.* at 25. In Claim Twelve, German argues that the trial court denied him due process when it "changed the definition and elements of justifiable homicide in its instructions to the jury." *Id.* at 26. In Claim Thirteen, German contends that the trial court erred in denying his motion for acquittal because—he says—the evidence was insufficient to sustain his convictions. *Id.* at 27. In Claim Fourteen, German blames his lawyer for not closing last—that is, for not objecting to the procedure by which the State gave its closing arguments *after* German's counsel had finished. *Id.* at 28. And, in Claim Fifteen, German argues that "the cumulative error [sic] in this case resulted in the denial of petitioner's right to a fair trial." *Id.* at 28.

In her Report, Magistrate Judge Reid recommended that this Court deny eight of those claims as *both* unexhausted and, because the time to exhaust them had elapsed, procedurally barred. *See* Report at 16. German objects. *See* Obj. 1–4. For these unexhausted and procedurally defaulted claims, German advances three arguments.

*First*, German says that he did exhaust Claim One. *See* Obj. at 2. Although Judge Reid found that German *admitted* his failure to exhaust this Claim, German insists that his admission was, in so many words, compelled by "the format of the habeas corpus petition which inmates are required to use when submitting his claims in this Court." *Id.* In fact, German assures us, he raised this Claim in a prior motion for post-conviction relief. *Id. Second*, German challenges the Report's

12

conclusion that he failed to exhaust Claim Six. *See id*. at 6. In particular, German quibbles with Judge Reid's determination that, with respect to this Claim, he had not "fairly presented" a federal issue in his state-court appeal. *Id*. *Third*, citing the Supreme Court's decision in *Martinez v. Ryan*, 566 U.S. 1 (2012), German asks this Court to excuse his failure to exhaust Claims Three, Four, Ten, Eleven, Twelve, Fourteen, and Fifteen because—he says—those claims were so "substantial" that no competent counsel would have omitted them. Obj. at 4.

The Report also rejected each of German's remaining claims (Two, Five, Seven, Eight, Nine, and Thirteen) on the merits, and German objects to the Report's findings as to each. *See id*. at 4–9.

This Order overrules German's Objections for three main reasons. *First*, Claims One, Three, Four, Eleven, and Fourteen are unexhausted, procedurally defaulted, and—despite German's insistence to the contrary—neither meritorious nor "substantial." *Second*, Claims Five, Six, Ten, Twelve, and Fifteen are procedurally defaulted, and German has failed to supply a viable excuse. *Third*, as to Claims Two, Seven, Eight, Nine, and Thirteen, German has not established that the state court's determinations violated the strictures of 28 U.S.C. § 2254(d)–(e). German's Petition is therefore **DENIED**.

## THE LAW

### I.      AEDPA Generally

AEDPA instructs district courts to deny any claim that was "adjudicated on the merits" in a state-court proceeding unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable

13

determination of the facts in light of the evidence presented in the State court proceeding." *Harrington v. Richter*, 562 U.S. 86, 97–98 (2011) (summarizing 28 U.S.C. § 2254(d)–(e)).

To have "adjudicated [the claim] on the merits," the state court need not have issued any kind of formal opinion or even outlined its reasoning. *Id.* at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). Rather, when a state court does not include the reasons for the denial, the federal court must "'look through' the unexplained decision to the last related state-court decision that does provide a rationale" and "then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

"Clearly established Federal law" means "the holdings, as opposed to the dicta, of [the United State Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). To be "contrary to clearly established federal law, the state court must either (1) apply a rule that contradicts the governing law set forth by Supreme Court case law, or (2) reach a different result from the Supreme Court when faced with materially indistinguishable facts." *Ward v. Hall*, 592 F3d 1144, 1155 (11th Cir. 2010) (cleaned up).

For "a state court's application of [Supreme Court] precedent" to be "'unreasonable, the state court's decision must have been more than incorrect or erroneous. The state court's application must have been objectively unreasonable." *Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003) (cleaned up). "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." *Harrington*, 562 U.S. at 101. "And an unreasonable application of those

14

holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice. To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded [sic] disagreement." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (cleaned up).

Section 2254(d) similarly prohibits federal judges from reevaluating a state court's factual findings unless those findings were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). To establish that a state court's factual findings were unreasonable, "the petitioner must rebut 'the presumption of correctness [of a state court's factual findings] by clear and convincing evidence.'" *Ward*, 592 F.3d at 1155–56 (quoting 28 U.S.C. § 2254(e)(1)).

"AEDPA's standard is intentionally difficult to meet." *Woods*, 575 U.S. at 315 (cleaned up). When reviewing state criminal convictions on collateral review, "federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong. Federal habeas review thus exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 316 (quotation marks omitted).

## II.      AEDPA Exhaustion

Under AEDPA, petitioners must file their federal habeas petitions within one year of the date on which their convictions became final. *See* 28 U.S.C. § 2244(d)(1). As relevant here, AEDPA requires "total exhaustion"—each of the petition's claims, in other words, must have been "fairly presented" to the state courts for adjudication. *See* 28 U.S.C. § 2254(b)(1)(A); *see also*

15

*Rhines v. Weber*, 544 U.S. 269, 274 (2005) ("AEDPA preserved *Lundy*'s total exhaustion requirement").

Generally speaking, "mixed" petitions—those with both exhausted and unexhausted claims—must be dismissed. *Kelley v. Sec'y, Fla. Dept. of Corr.*, 377 F.3d 1317, 1351 (11th Cir. 2004) ("[A] district court must dismiss such mixed petitions, leaving the prisoner with the choice of returning to state court to exhaust his claims or of amending or resubmitting the habeas petition to present only exhausted claims to the district court." (cleaned up)). But "when it is obvious that the unexhausted claims would be procedurally barred in state court due to a state-law procedural default, we can forego the needless 'judicial ping-pong' and just treat those claims now barred by state law as no basis for federal habeas relief." *Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998). One more thing on procedural defaults: "Federal courts may not review a claim procedurally defaulted under state law if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar, and the bar presents an independent and adequate state ground for denying relief." *Hill v. Jones*, 81 F.3d 1015, 1022 (11th Cir. 1996).

There are, however, two exceptions to the general rule that a federal court may not consider a procedurally defaulted claim on the merits: "cause and prejudice" and "actual innocence." *See Dretke v. Haley*, 541 U.S. 386, 393 (2004) ("[A] federal court will not entertain a procedurally defaulted constitutional claim in a petition for habeas corpus absent a showing of cause and prejudice to excuse the default. We have recognized a narrow exception to the general rule when the habeas applicant can demonstrate that the alleged constitutional error has resulted in the conviction of one who is actually innocent of the underlying offense."); *see also Tharpe v. Warden*, 898 F.3d 1342, 1346 (11th Cir. 2018) ("A federal court cannot review a procedurally defaulted

16

claim unless the petitioner can show cause for the failure to properly present the claim and actual prejudice." (citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977))). "To establish 'cause' for a procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in the state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). "[A]llegations [supporting cause and prejudice] must be factual and specific, not conclusory." *Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011).

## ANALYSIS

As an initial matter, there is no dispute that German's Petition is timely. *See* Report at 10. The state court, after all, vacated German's original judgment and resentenced him (on the murder count) to 40 years in prison on June 26, 2017. *See* Resentencing Forms [ECF No. 12-3] at 258–67. A habeas petition filed after a vacated judgment is not "second or successive if it challenges a 'new judgment'"—so long as the new judgment "'authorize[es] the prisoner's confinement.'" *Patterson v. Sec'y, Fla. Dep't of Corr.*, 849 F.3d 1321, 1325, 1326–27 (11th Cir. 2017) (en banc) (quoting *Magwood v. Patterson*, 561 U.S. 320, 332 (2010). "The relevant question is not the magnitude of the change, but the issuance of a new judgment *authorizing* the prisoner's confinement." *Id*. Given AEDPA's one-year window, German thus had until June 25, 2018 to file this Petition. Because he filed it on October 13, 2017, the Petition is timely.

### I.     The Unexhausted Claims: One, Three, Four, Five, Six, Ten, Eleven, Twelve, Fourteen, and Fifteen

### A.     Exhaustion

Habeas petitioners generally cannot raise, in federal court, claims that were not first exhausted in state court. *See* 28 U.S.C. § 2254(b)(1)(A) (requiring that "the applicant has

exhausted the remedies available in the Courts of the state"). To count as exhausted, a federal claim must be "fairly presented" to the state court. *Picard v. Connor*, 404 U.S. 270, 275 (1971). And, to be fairly presented, "[i]t is not sufficient merely that the federal habeas petitioner has been through the state courts . . .  nor is it sufficient that all the facts necessary to support the claim were before the state courts or that a somewhat similar state-law claim was made." *Kelley*, 377 F.3d at 1343–44 (citing *Picard*, 404 U.S. at 275–76). Rather, "a state prisoner [must] present the state courts with the same claim he urges upon the federal courts." *Picard*, 404 U.S. at 275 (internal citations omitted). In doing so, the petitioner must present his claims in such a way "that a reasonable reader would understand each claim's particular legal basis and specific factual foundation." *Kelley*, 377 F.3d at 1344–45 (citing *Picard*, 404 U.S. at 277). Finally, the petitioner must "present his claims to the state's highest court, even if such review is discretionary, if such review is part of the ordinary appellate review procedure." *Mancill v. Hall*, 545 F.3d 935, 939 (11th Cir. 2008). In practice, these rules "afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary." *McNair v. Campbell*, 416 F.3d 1291, 1302 (11th Cir. 2005).

The Magistrate Judge concluded that German had failed to exhaust Claims One, Three, Four, Six, Ten, Eleven, Twelve, Fourteen, and Fifteen. *See* Report at 10. In fact, according to the Magistrate Judge, German had conceded that—aside from Claim Six—each of these Claims was unexhausted. *Id*. German objects to this conclusion as it applies to Claims One and Six. *See* Obj. 2–4.[9]

---

[9] German does not object to the Report's conclusion that Claims Three, Four, Ten, Eleven, Twelve, Fourteen, and Fifteen are unexhausted. *See* Obj. at 4. The Court has reviewed this aspect of the

In Claim One, German alleges that his state trial counsel was ineffective for failing to attack his convictions under the Double Jeopardy Clause. Pet. at 7. In his Objections, German agrees that, "[i]n the habeas petition, the petition did state that this claim was not exhausted below." Obj. at 2. But German attempts to excuse this glaring omission by blaming "the format of the habeas corpus petition which inmates are required to use when submitting his claims in this Court." *Id*.

The Court cannot accept German's characterization of the habeas form, which adequately allows petitioners to describe whether their claims are exhausted—and, if so, how, when, and where. *See* Pet. at 9. Nor does German's attempt to rely on the form's "format" to excuse his concession make any sense. German, after all, wrote the following unambiguous concession onto a clean sheet of paper: "Petitioner did not exhaust state remedies on this issue because there is currently an absence of available state corrective process, and it appears that the Petitioner has no right under the law of the State of Florida to pursue the issue at this point." *Id*. at 8. More dispositive still, on the next page, German answered "No" when asked: "If you appealed from the judgment of conviction, *did you raise this issue*?" *Id*. at 9 (emphasis added). In saying so, German (correctly) explained that ineffective-assistance-of-counsel claims "cannot be raised in direct appeal in Florida." *Id*. But this procedural truism does not justify German's failure to push this question— as he was required to do—in his *collateral* appeals. For this reason alone, German's Claim One is unexhausted.

---

Report's conclusion for clear error, *see* FED. R. CIV. P. 72(b)—and, seeing none, now adopts and affirms it.

Either way, even now, German never suggests that he raised Claim One in his 2001

collateral appeal. *See* Obj. at 2. To the contrary, in his Objections, German avers that he asserted

Claim One only in his 2012 Rule 3.800 motion.[10] *Id*. Not so. In that motion, German argued only

that "the trial court arrived at an illegal sentence by calculating points in the guideline scoresheet

---

[10] This discussion highlights an interesting (if tangential) issue. As we have established—q.v., the above analysis on timeliness—a second (or, as here, third) federal habeas petition is not "second or successive" within the meaning of § 2244(b)(1) if it follows a resentencing. Extrapolating from this principle, one might suppose that, to (re)exhaust his federal claims, a federal habeas petitioner must, in his first (state) collateral attack *after* the resentencing, (re)raise all the claims he had exhausted *before* the resentencing. So, for example, one might surmise that, because German was resentenced in 2016—and since that resentencing (re)started his AEDPA clock—this Court, in deciding which claims he's exhausted, should look to the claims he advanced in his 2016 Rule 3.850 motion (rather than those he made in 2001). If this were the rule, all fifteen of the claims he makes here—and not just the ten he failed to raise in 2001—would be unexhausted, because he failed to address *any* of these objections in 2016.

On the other hand, since the resentencing plainly did not disturb (and, if we're being honest, had nothing to do with) his underlying criminal conviction—and given that all but one of his claims here (Claim One on Double Jeopardy) attack his conviction, not his sentence—it's hard to see why we would require him to (re)assert the liability-based claims he had already fully exhausted. (Interpolation: The resentencing—which resulted from an incorrect guidelines calculation—likewise had nothing to do with the Double Jeopardy Claim he makes here.) In this respect, see *Magwood*, 561 U.S. at 340 (After resentencing, "[a] petitioner may not raise in federal court an error that he failed to raise properly in state court in a challenge to the judgment *reflecting the error*." (emphasis added)). This latter view—which this Court will follow here—finds added support in the efficiency concerns Congress addressed when it enacted AEDPA. *See Williams v. Taylor*, 529 U.S. 362, 386 (2000) ("Congress wished to curb delays, to prevent 'retrials' on federal habeas, and to give effect to state convictions to the extent possible under law. When federal courts are able to fulfill these goals within the bounds of the law, AEDPA instructs them to do so."). After all, since the resentencing did not even purport to address the propriety of German's conviction—and since the state's highest court had already rejected German's challenges to that conviction—it would seem a waste of everyone's time to require him, like Sisyphus, to push that same liability rock all the way up the same old hill of (futile) state appeals.

Fortunately, while the issue appears to be one of first impression in this Circuit, the Court need not resolve it here, because—even assuming that German properly exhausted Claims Two, Five, Eight, Nine, and Thirteen by raising them in his 2001 motion—these "exhausted" claims are meritless in any event. (Of course, the result would be the same if German had to (re)raise these five claims in his 2016 motion because, in that case, the claims would be unexhausted and, under the test laid out in *Martinez*, *infra* I.C., insubstantial.)

that were obtained through the improper use of a hibitualized [sic] offense as the primary offense at conviction." 2012 Rule 3.800 Motion [ECF No. 12-3] at 93. And, when he appealed the denial of that motion, he contended only that his sentence violated the Double Jeopardy Clause, *see* 2012 Rule 3.800 Appeal Opening Brief [ECF No. 12-3] at 212—not, as he now suggests, that *his counsel was ineffective* for failing to challenge his conviction on Double Jeopardy grounds.[11] Pet. at 7. Claim One, in short, is unexhausted.

In Claim Six, German says that the trial court's admission of hearsay testimony violated his right to confront the witnesses against him. *See id.* at 18. But the law is clear that a *state* court's determination of *state* evidence law does not present a cognizable federal habeas claim. *See Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) ("[W]e have repeatedly held that federal habeas corpus relief does not lie for errors of state law." (citing *Estelle v. McGuire*, 502 U.S. 62, 67 (1991))). German (notably) does not object to this conclusion. *See* Obj. at 6. Instead, German insists that he did, in fact, raise a federal Confrontation Clause claim in his direct appeal. *Id*. In the alternative, he blames his appellate counsel's ineffectiveness for his failure to present a Confrontation Clause claim on direct appeal. *Id*.

In his direct appeal, German admittedly dedicated four full pages of his opening brief to the trial court's admission of hearsay testimony. *See* Direct Appeal Opening Brief [ECF No. 12-1] at 47, 67–70. But in this discussion—protracted though it was—German's counsel argued only

---

[11] He also claimed that "the successor judge reversibly erred in overruling Judge Gold's order which required appellant to be resentenced with the use of a corrected scoresheet," and that "the successor judge lacked jurisdiction to grant the stats [sic] untimely motion for reconsideration." 2012 Rule 3.800 Appeal Opening Brief [ECF No. 12-3] at 217. The Fourth DCA granted German relief on the second argument—and remanded for him to be resentenced—but held that "appellant cannot raise a double jeopardy claim attacking his convictions under rule 3.800(a)." *Id*. at 252.

that the trial court had violated *Florida* law in admitting certain hearsay statements. *Id*. at 67. In particular, German listed three specific hearsay grievances. *First*, as to witnesses Don Allie and Deputy Williams, German said that their testimony did not meet the strictures of FLA. STAT. § 90.801(2)(c)—which governs the admissibility of statements "of identification of a person made after perceiving the person"—because "a description of an individual is not an identification of an individual." Direct Appeal Opening Brief [ECF No. 12-1] at 67–68. *Second*, with respect to the trial court's alternative ruling that the victim's statements to Detective Williams were admissible as "excited utterances," *id.* at 68, German contended that the State had failed to lay "a predicate" for its position that "the necessary state of mind is present," *id*. at 69. *Third*, German objected to the court's decision to admit the victim's statements to paramedic Steven Woodberry as either excited utterances or statements made for diagnosis or treatment. *Id.* at 69–70. As to the former, German submitted (again) that the State had failed to lay a proper foundation and that, in any case, the statements should have been "limited to a victim's pain and sensations." *Id*. at 70. As to the latter, German insisted that Woodberry's testimony about what the victim had told him (i.e. "that a black female had knocked on his door and that he opened the door for the black female and two other black males had entered the apartment and demanded that he open the safe") was not "for the purpose of medical diagnosis or treatment." *Id*.

At no point, however, did German's brief contend that any of these statements were "testimonial" within the meaning of the Confrontation Clause or, relatedly, that their primary purpose was to "establish or prove past events potentially relevant to later criminal prosecutions." *Michigan v. Bryant*, 562 U.S. 344, 356 (2011) (citing *Davis v. Washington*, 547 U.S. 813, 847 (2006)). German, in fact, did not cite a *single* federal case at all or explain how the state cases he

22

did cite implicated the Confrontation Clause—even obliquely. *See generally* Direct Appeal Opening Brief [ECF No. 12-1] 67–70. German's appellate brief did, to be sure, mention the Confrontation Clause once—though, even then, it did so only in passing. *Id*. at 70. ("The cumulative effect of the Court's rulings regarding these inadmissible hearsay statements over the Defendant's objections violated Appellant's Sixth Amendment right to confrontation as guaranteed by the United States Constitution, and resulted in substantial prejudice to Appellant, thereby denying his right to a fair trial, requiring a reversal of the Appellant's convictions."). In these circumstances, the Court agrees with the Magistrate Judge that no "reasonable reader" of German's appeal "would understand" that he was grounding his argument in the Confrontation Clause. *Kelley*, 377 F.3d at 1344–45 (citing *Picard*, 404 U.S. at 277). Certainly, German failed to "afford the state courts a meaningful opportunity to consider allegations" that his Confrontation Clause rights had been infringed. *McNair v. Campbell*, 416 F.3d 1291, 1302 (11th Cir. 2005).

This conclusion finds support in the Eleventh Circuit's decision in *McNair*, where—as here—the petitioner's "nine page petition . . . did not cite a single federal case; its only mention of federal law was a repetition of the concluding paragraph of his argument before the Court of Criminal Appeals." *Id*. at 1303. Affirming the district court's determination that McNair's claims were procedurally barred, the court held that McNair had not "fairly presented" his federal claim because:

> [he] never cited any United States Supreme Court or federal appellate court case dealing with extraneous evidence, nor did he mention the presumption of prejudice that arises under federal law when jurors consider such evidence. Instead, he relied on state law opinions to argue a state law claim under a state law standard, citing a lone federal district court opinion (which itself did not mention the federal presumption of prejudice) only as part of a string citation illustrating various courts' holdings with respect to extraneous evidence in the jury room.

23

*Id*. at 1304.

*McNair*'s holding in this respect is not (at all) aberrational. Eight years later, for example, in *Ivy v. Fla. Dep't of Corr.* 543 F. App'x 923 (11th Cir. 2013), the Eleventh Circuit again affirmed the district court's imposition of a procedural bar, where—like German—the petitioner had failed to cite any federal law in his state-court appeal. As the court explained:

> Although Ivy summarily claimed on direct appeal of his state conviction that the state trial court violated his constitutional right to a full and fair cross-examination of his accuser, Ivy failed to indicate that this claim was federal in nature. He never labeled this claim as a federal claim. He did not cite the U.S. Constitution, a federal statute, or federal case law in support of this claim. He cited only state case law. And, the state case law he cited did not address federal law.

*Id*. at 927. The same could be said of German's direct appeal in this case. Indeed, the Eleventh Circuit has specifically addressed the sufficiency of a federal habeas petitioner's passing, citation-less reference—in his state-court direct appeal—to the Confrontation Clause. *See Lucas v. Sec'y, Dep't of Corr.*, 682 F.3d 1342 (11th Cir. 2012). And, as here, the Eleventh Circuit found that "[s]imply referring to a constitutional right of confrontation of witnesses is not a sufficient reference to a federal claim." *Id*. at 1351 (quotation marks omitted). German, in sum, failed to "fairly present[]" Claim Six in his direct appeal.[12]

---

[12] For the first time in his Objections, German blames his failure to exhaust Claim Six on "trial counsel and/or appellant counsel's ineffectiveness." Obj. at 6. In saying so, however, German is really arguing, not that he *exhausted* Claim Six, but that his non-exhaustion should be *excused*. The problem, of course, is that, in his Petition, German claims only that he exhausted Claim Six, Pet. at 18; he never says—or even suggests—that his non-exhaustion of that Claim should be excused. More fundamentally, he never presented this (new) argument to the Magistrate Judge, who thus never had a chance to consider it in writing her Report. This Court will not consider an argument German never submitted to the Magistrate Judge in the first instance. *Cf. Williams v. McNeil*, 557 F.3d 1287, 1292 (11th Cir. 2009) ("The district court in this case had the discretion whether to consider Williams's argument regarding timeliness of his habeas petition when he did

Lastly, the Report determined that German had properly exhausted Claim Five—in which German avers that the trial court "committed fundamental error by permitting into evidence the secretary's transcribed record of a police report as petitioner's confession," Pet. at 17—because the issue had been litigated at trial. *See* Report at 23. Neither side objected to this conclusion. But, reviewing the issue for clear error, this Court disagrees. To exhaust a claim, the petitioner must present it *on direct appeal. See Pope v. Rich*, 358 F.3d 852, 853 (11th Cir. 2004) ("The United States Supreme Court has interpreted § 2254(c) to require a state prisoner to present his claims to the state's highest court, even if review is discretionary, when such review is part of the ordinary appellate review procedure." (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999))). German did not raise Claim Five in his direct appeal. *See generally* Direct Appeal Opening Brief [ECF No. 12-1] at 46. Nor does anyone ever suggest that he did. Claim Five, then, is also unexhausted.

The Court therefore affirms the Report's determination that Claims One, Three, Four, Six, Ten, Eleven, Twelve, Fourteen, and Fifteen are unexhausted. In addition, the Court finds that German did not exhaust Claim Five, either.

## B.    Procedural Default

The Report found that, even if German were to bring these unexhausted claims in state court, they would be procedurally defaulted because (1) his direct appeal is over, and (2) he has no additional post-conviction motions available to him. *See* Report at 12; *cf. Greenwood v. Sec'y, Dep't of Corr.*, 794, F. App'x 831, 834 (11th Cir. 2019) ("It is clear that Greenwood's unexhausted

---

not raise the argument in the first instance to the magistrate judge."); *United States v. Howell*, 231 F.3d 615, 622 (9th Cir. 2000) ("To require a district court to consider evidence not previously presented to the magistrate judge would effectively nullify the magistrate judge's consideration of the matter and would not help to relieve the workload of the district court.").

claim would be procedurally barred in state court because he has not alleged newly discovered evidence or a new constitutional right," and "second or successive Rule 3.850 petitions are not permitted absent allegations of newly discovered evidence or a new constitutional right" (cleaned up)).

German does not object to this conclusion, and it is plainly right in any event. At the very least, it is not clearly erroneous under FED. R. CIV. P. 72(b). Rule 3.850 motions, after all, must be filed within two years of the final judgment. *See* FLA. R. CRIM. P. 3.850(b) ("A motion to vacate a sentence that exceeds the limits provided by law may be filed at any time. No other motion shall be filed or considered pursuant to this rule if filed more than 2 years after the judgment and sentence become final[.]"). The state court entered German's amended judgment—the judgment that incorporated his resentencing—on June 26, 2017. *See* Resentencing Forms [ECF No. 12-3] at 258–67. His window for filing another Rule 3.850 motion thus expired on June 25, 2019.

The Court, then, affirms the Report's conclusion that Claims One, Three, Four, Six, Ten, Eleven, Twelve, Fourteen, and Fifteen are procedurally defaulted. And, for similar reasons, the Court overrules the Report and finds that Claim Five is likewise defaulted.

### C.    Cause and Prejudice

Noting that he did not have a lawyer during his post-conviction motions practice—and relying heavily on the Supreme Court's decision in *Martinez*—German asks this Court to excuse his procedural default. *See* Obj. at 1–5. His request is unpersuasive.

German faces a tough uphill battle. "Cause," after all, is a rather narrow exception to the general rule that procedurally defaulted claims should be dismissed. *See Mize v. Hall*, 532 F.3d 1184, 1190 (11th Cir. 2008) ("A procedurally defaulted claim can support federal habeas relief in

only two narrow situations."). "Cause" exists only if "there was some objective factor external to the defense that impeded counsel's efforts to comply with the State's procedural rule." *Id.* (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (internal alterations omitted)). A petitioner can meet the "cause" element by showing either that the factual or legal basis for his claim was not reasonably available to counsel, *see Reed v. Ross*, 468 U.S. 1, 16 (1984), or that "some interference by officials" made compliance with the state procedural law impracticable, *see Brown v. Allen*, 344 U.S. 443, 486 (1953).

Before 2012, § 2254 petitioners could not establish "cause" by relying merely on the errors of their state-appointed collateral counsel. *See Coleman v. Thompson*, 501 U.S. 722 (1991) ("There is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." (internal citations omitted)). In that year, however, the Supreme Court carved out a narrow exception to the *Coleman* rule, under which a § 2254 petitioner could excuse his procedural default in the following (very limited) circumstance:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a *substantial* claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Martinez*, 566 U.S. at 17 (emphasis added). As the Court noted, in a *Martinez* scenario, "the collateral proceeding is in many ways the equivalent for a prisoner's direct appeal as to the ineffective-assistance claim." *Id.* at 11.

27

The following year, the Court applied *Martinez*, not just to states that *expressly* preclude defendants from raising ineffectiveness claims on direct appeal, but also to states that *effectively* do so. *See Trevino v. Thaler*, 569 U.S. 413, 429 (2013) ("Thus, for present purposes, a distinction between (1) a State that denies permission to raise the claim on direct appeal and (2) a State that in theory grants permission but, as a matter of procedural design and systemic operation, denies a meaningful opportunity to do so is a distinction without a difference.").

Still, this exception remains a narrow one. *See Lambrix v. Sec'y, Fla. Dep't of Corr.*, 756 F.3d 1246, 1260 (11th Cir. 2014) ("In general, lack of an attorney and attorney error in state post-conviction proceedings do not establish cause to excuse a procedural default."). And, in 2017, the Supreme Court made it narrower still by delimiting the *Martinez* exception only to claims that the postconviction lawyer was ineffective for failing to challenge the incompetence of *trial* counsel. *See Davila v. Davis*, 137 S. Ct. 2058, 2062 (2017) ("[I]neffective assistance by a prisoner's state postconviction counsel [could act] as cause to overcome the default of a single claim—ineffective assistance of trial counsel—in a single context—where the State effectively requires a defendant to bring that claim in state postconviction proceedings rather than on direct appeal."); *cf. Martinez*, 566 U.S. at 14 ("The rule of *Coleman* governs in all but the limited circumstances recognized here.").

To show "cause" under *Martinez*, then, German must establish the following three elements: (1) Florida "effectively" prohibits prisoners from advancing ineffectiveness claims on direct appeal; (2) in his "initial-review collateral proceeding," German either had "no counsel" [13]

---

[13] While *Martinez* did not explicitly hold that its exception applies to petitioners who were *pro se* at their initial-review collateral proceeding, the Eleventh Circuit has subsequently clarified that it

28

or else his counsel was constitutionally ineffective; and (3) his claim of ineffective assistance of *trial* counsel is "substantial." *Martinez,* 566 U.S. at 17.

German has satisfied the first two elements here. In Florida, "with rare exception[,] ineffective assistance of counsel claims are not cognizable on direct appeal." *Gore v. State*, 784 So.2d 418, 437–38 (Fla. 2001). And German had "no counsel" for his initial-review collateral proceeding. *See* 2001 Rule 3.850 Motion [ECF No. 12-1] at 107.

But, to qualify under *Martinez*, the ineffective-assistance-of-counsel claim—the one the *pro se* petitioner should have raised in his initial-review collateral proceeding but didn't—must be "a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 566 U.S. at 14. And an ineffective-assistance-of-counsel claim "has merit" only if the petitioner can make "a substantial showing of the denial of a constitutional right." *Id*. at 14.

To do this, the petitioner must satisfy the two elements of the test laid out in *Strickland v. Washington*, 466 U.S. 668 (1984). *See, eg.*, *Newsom v. Sec'y, Dep't of Corr.*, 797 F. App'x 488,

---

does. *See Lambrix*, 851 F.3d at 1164. As that court explained: "The Supreme Court, however, set strict parameters on the application of this exception. It applies only where (1) state law requires a prisoner to raise ineffective-trial-counsel claims during an initial collateral proceeding and precludes those claims during direct appeal; (2) the prisoner failed to properly raise ineffective-trial-counsel claims during the initial collateral proceeding;  (3) the prisoner ***either did not have counsel or*** his counsel was ineffective (or his appointed counsel was ineffective by not raising ineffective-trial-counsel claims; and (4) failing to excuse the prisoner's procedural default would result in the loss of a 'substantial' ineffective-trial-counsel claim." *Id*. at 1164 (emphasis added); *see also Riggs v. Warden, Blackwater River Corr. Facility*, 685 F. App'x 812, 816 (11th Cir. 2017) (applying *Martinez* where "(3) the prisoner ***had no counsel*** (or his appointed counsel was ineffective by not raising ineffective-trial-counsel claims) in the initial-review collateral proceeding" (emphasis added)); *Sneathen v. Sec'y, Dep't of Corr.*, 787 F. App'x 567, 572 (11th Cir. 2019) ("Sneathen litigated his postconviction motion *pro se* after the state court denied his motion for appointed counsel. Sneathen's *pro se* status establishes cause to excuse his procedural default. *See Martinez*, 132 S. Ct. at 1318. Sneathen's claim is also substantial. *See id*.").

29

496 (11th Cir. 2019) ("[T]he district court properly determined that Claims 1 and 2 were procedurally defaulted because Newsom did not show that his ineffectiveness claims were 'substantial' under *Strickland* in order to overcome the default."). "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id*.

Starting with the first ("deficient performance") factor, "the proper standard for attorney performance is that of reasonably effective assistance." *Id*. Specifically, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id*. at 688. In making this determination, courts must consider "all the circumstances." *Id*. But "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Id*. (cleaned up). For this reason, "[s]trategic choices made after thorough investigation of the law and facts relevant to plausible options are *virtually unchallengeable*." *Id.* at 690–91 (emphasis added). This is because "the Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance[.]" *Burt*

30

*v. Titlow*, 571 U.S. 12, 20 (2013). Courts should remember, in other words, that "[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689. The Court's review of counsel's performance, therefore, should focus "not [on] what is possible or what is prudent or appropriate but only [on] what is constitutionally compelled." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000); *see also Burger v. Kemp*, 483 U.S. 776 (1987) (same). Finally, conclusory allegations of ineffectiveness are insufficient to satisfy the *Strickland* test. *See Boyd v. Comm'r, Ala. Dep't of Corr.*, 697 F.3d 1320, 1333–34 (11th Cir. 2012) ("Taking these vague and conclusory allegations together, the Alabama Court of Criminal Appeals determined that Boyd's claim fell far short, on its face, of establishing either *Strickland*'s performance or prejudice prong.").

Turning to *Strickland*'s second ("prejudice") prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*. Note, however, that a court need not address both *Strickland* prongs if the petitioner fails to carry his burden as to one of those prongs. *See id*. at 697 ("Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.").

31

At his initial (2001) collateral-review proceeding, German argued that his trial counsel was ineffective: (1) for not using all his preemptory challenges, *see* 2001 Rule 3.850 Motion [ECF No. 12-1] at 109; (2) for threatening to abandon him if he testified, *id.* at 126–27; and (3) for not objecting to the trial court's jury instruction that the verdict had to be unanimous, *id.* at 136. But he did not raise the objections he now couches as Claims One, Three, Four, Five, Six, Ten, Eleven, Twelve, Fourteen, and Fifteen. The question, then, is whether these claims are, on the merits, "substantial." They are not.

### a. Claim One: Double Jeopardy

German did not raise a Double Jeopardy challenge at trial, on direct appeal, or in his initial-review collateral proceeding. *See generally* Transcript [ECF No. 13-1]; Direct Appeal Opening Brief [ECF No. 12-1] at 46; 2001 Rule 3.850 Motion [ECF No. 12-1] at 107. He now says that his trial counsel was unconstitutionally ineffective for failing to do so. *See* Memo at 5. His claim is therefore unexhausted and procedurally barred unless he can show some excuse.

And (as we have said), to establish that excuse, German would need to demonstrate both deficient performance and prejudice. *See Strickland*, 466 U.S. at 697–98 ("The principles governing ineffectiveness claims should apply in federal collateral proceedings as they do on direct appeal or in motions for a new trial. . . . Since fundamental fairness is the central concern of the writ of habeas corpus, no special standards ought to apply to ineffectiveness claims made in habeas proceedings." (internal citations omitted)). But German cannot show deficiency because his Double Jeopardy claim is meritless—and so, his lawyer could not have been ineffective for failing to raise it. *See United States v. Nyhuis*, 211 F.3d 1340, 1344 (11th Cir. 2000) ("[C]ounsel is not ineffective for failing to raise claims reasonably considered to be without merit." (cleaned up)).

German's Claim One boils down to this: his lawyer was ineffective, he says, for failing to argue that the Double Jeopardy Clause barred the State from punishing him for *both* felony murder *and* (the underlying) robbery. *See* Memo at 5. As German points out, "if the statute does not clearly authorize cumulative punishments, then the court must apply the test set out in Blockburger v. U.S., 384 U.S. 299 (1932) to determine if offenses are sufficiently distinguishable to permit the imposition of cumulative punishments." *Id.* And, German adds, since the elements of his robbery offense are wholly contained within the elements of felony murder, the state court violated the Double Jeopardy Clause by sentencing him on both counts. *See id*. ("Because the felony murder contains essential elements not contained in the robbery, but all the essential elements necessary for the robbery conviction are in fact contained in and are necessary for the felony murder conviction, the offenses are not sufficiently distinguishable to permit the cumulative punishments.").

But there are at least two problems with German's position. *First*, as German concedes, the Double Jeopardy Clause applies *only* when the legislature has failed to authorize double punishment. *See Brown v. Ohio*, 432 U.S. 161, 165 (1977) ("Where consecutive sentences are imposed at a single criminal trial, the role of the constitutional guarantee is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense."). In this sense, the *Blockburger* test operates as a default rule only in the absence of state legislation. *See id*. ("[T]he Fifth Amendment double jeopardy guarantee serves principally as a restraint on courts and prosecutors. The legislature remains free under the Double Jeopardy Clause to define crimes and fix punishments[.]"). And, at the time of German's offense, the Florida legislature had *expressly authorized* consecutive punishment for anyone who, in a single criminal

33

episode, committed multiple criminal offenses. *See* FLA. STAT. § 775.021(4)(a) (1988) (amended 2014) ("Whoever, in the course of one criminal transaction or episode, commits an act or acts which constitute one or more separate criminal offenses, upon conviction and adjudication of guilt, shall be sentenced separately for each criminal offense; and the sentencing judge may order the sentences to be served concurrently or consecutively.").

*Second*, when German committed his crimes in 1992, *see* Indictment [ECF No. 12-1] at 14, both the Florida Supreme Court *and* the Eleventh Circuit Court of Appeals had held that the Double Jeopardy Clause did not bar a Florida judge from imposing consecutive punishments for felony murder and robbery. *See State v. Enmund*, 476 So.2d 165, 167–68 (Fla. 1985); *Fallada v. Dugger*, 819 F.2d 1564, 1573 (11th Cir. 1987). In *Enmund*, for instance, the Florida Supreme Court found "sufficient intent that the legislature intended multiple punishments when both a murder and a felony occur[ed] during a single criminal episode." *Enmund*, 476 So.2d at 167. And, in *Fallada*, the Eleventh Circuit similarly held: "It is clear, therefore, that Fallada's convictions of and sentences for both felony murder and the underlying felony of robbery do not violate double jeopardy and therefore must stand." *Fallada*, 819 F.2d at 1573. Notably, the law on this issue had not changed when German's convictions became final in 1997. *See Boler v. State*, 678 So.2d 319, 322 (Fla. 1996) ("For the reasons discussed above, we conclude that neither *Dixon* [*United States v. Dixon*, 509 U.S. 688 (1993)] nor [recent amendments to] section 775.021(4) prohibits a Florida defendant from being separately convicted and sentenced for felony murder and the qualifying felony.").

Since these decisions would have *required* the state court to deny German's Double Jeopardy Claim, his lawyer cannot be faulted for failing to advance it. *See Nyhuis*, 211 F.3d at

1344. Claim One is therefore meritless—and, by definition, insufficient (even under *Martinez*) to excuse his procedural default.

### b. Claim Three: Deposing or Calling James Carr

German contends that his trial counsel was ineffective for not deposing or calling Detective James Carr. *See* Pet. at 7. German did not advance this claim in his 2001 collateral proceeding. *See* 2001 Rule 3.850 Motion [ECF No. 12-1] at 107. His claim is therefore unexhausted and procedurally barred unless he can establish some excuse.

To understand why German can show no such excuse, it's helpful to understand the context from which the claim arises. After his 1995 arrest, German was interviewed by Detectives Chris Murray and James Carr of the Broward County Sheriff's Office. *See* Memo at 7. During that interview—in which Detective Murray took notes[14]—German apparently confessed to the crimes. *Id.* Before trial, German's lawyer filed a motion to suppress the confession (whose absence from this record the parties never explain). The trial court held a hearing on the motion, at which both Detective Murray and German testified. *See* Transcript at 36–66 (Murray), 81–132 (German).

In his testimony, German admitted that he had earned his GED, *id*. at 98; that he had been arrested between ten and fifteen times, *id*. at 113–14; that he did not trust the Detectives when they promised him a more lenient sentence because "a detective had made a promise to me like that before," *id.* at 106; and that his signature was on the waiver-of-rights form, *id* at 102 ("Like I said, it's my signature"). German also testified that, during the interview, Detective Carr "started getting, like violent, hitting on the table and stuff," *id*. at 104, which "scared" him, *id*. at 105.

---

[14] *See* Transcript at 36–66, 420–603.

Ultimately, then—German said—he "t[old] the detective several times I wasn't going to sign" the form. *Id*. at 102.

Detective Murray, by contrast, testified that the Detectives "made [German] comfortable at our office. He was offered water, soda, the bathroom," *id*. at 39; that German read and signed the waiver-of-rights form, *id*. at 40; that he (Murray) went over each right with German and, afterwards, asked German if he had any questions, *id.* at 40–45; that both Detectives watched German sign the form, *id*. at 46; and that he (Murray) offered to record the interview—an offer German declined, *id*. at 47. Detective Murray also (vehemently) denied that "Detective Carr or any other law enforcement officer [did] anything that would be construed as a threat, either verbal or non-verbal." *Id*. at 49; *see also id*. at 55 ("Mr. Loe: Was there any action on any law enforcement that indicated to you that there was some sort of threatening going on, either verbal or non-verbal? Detective Murray: No, there wasn't.").

After hearing from both sides, the trial court found that "the defendant was advised of his *Miranda* Rights; that he freely, knowingly, voluntarily and intelligently waived those rights and gave a statement voluntarily" and denied German's motion to suppress. Transcript at 131. Detective Murray later repeated this testimony at trial, *id.* at 420–603—and the jury evidently found it believable because they promptly convicted German on all counts, *see* Verdict Forms [ECF No. 12-1] at 21–23.

Neither German nor the State elected to call Detective Carr. *See* Transcript at 624. German now blames his lawyer for failing to depose or call Carr as a witness—either at the suppression hearing or at trial. *See* Memo at 11. Had trial counsel done so, German insists, he *might* have discovered that Carr was being investigated for threatening other suspects with violence. *Id*. And

36

this, in turn—German maintains—would have corroborated German's claim that Detective Carr had coerced *his* confession. *Id.*

Again, though, there are two problems with this argument.

*First*, German has adduced no evidence, either in his Petition or in his Memorandum of Law, that Detective Carr was "being investigated" in 1995. *See* Pet. at 12–13; Memo at 11. Instead, in his 2004 Rule 3.850 Motion, he pointed to a 2002 Miami Herald article in which an internal investigation of Detective Carr was mentioned. *See* 2004 Rule 3.850 Motion [ECF No. 12-1] at 232. German's counsel, it goes without saying, cannot be faulted for failing to predict that, years after German's conviction became final, one of the interviewing detectives would be investigated for making threats against *other* criminal defendants. As far as we know, then, no 1995 cross-examination—or deposition—of Detective Carr would have revealed any such investigation.

But, even if Detective Carr had been investigated before 1995, the fact of that investigation alone would have been inadmissible in German's case. An investigation into police misconduct, after all, is not the same thing as a *finding* of misconduct; it is, rather, an accusation—nothing more. *See, e.g.*, *Suggs v. State*, 239 So.3d 699, 707 (Fla. 2017) ("If Suggs had known of the FDLE's investigation or the alleged misconduct by the Sheriff and prosecutor, that knowledge does not undermine our confidence in the verdict, as the related evidence would not have been admissible at Suggs's trial as either substantive or impeachment evidence."); *Bogle v. State*, 213 So.3d 833, 840 (Fla. 2017) ("We reject Bogle's claim that the trial court erred in refusing to allow questioning of Karen Cox, who was the prosecutor in Bogle's case, pertaining to any alleged prosecutorial misconduct in other cases."). And so, even if German's lawyer had uncovered an investigation into Detective Carr's behavior *prior to trial*, he would not have been permitted to

impeach Detective Carr with that information. *See Delap v. Dugger*, 890 F.2d 285, 299 (11th Cir. 1989) ("[A]s the district court noted, it is highly questionable whether the evidence would have been admissible under Florida law. [The police officer] had not been charged nor convicted of any crime during Delap's first or second trials.").

*Second*, "[t]he reasonableness of a counsel's performance is an objective inquiry." *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc). "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Id*. To meet the constitutional standard, counsel need not pursue every line of inquiry or investigate every possible lead. *See Hittson v. GDCP Warden*, 759 F.3d 1210, 1267 (11th Cir. 2014). Instead, "counsel has a duty to make *reasonable* investigations or make a *reasonable* decision that makes particular investigations unnecessary. Counsel need not always investigate before pursuing or not pursing a line of defense. Investigation (even a nonexhaustive, preliminary investigation) is not required for counsel reasonably to decline a line of defense thoroughly." *Id*. (cleaned up). Nor must counsel call every available witness. As the Eleventh Circuit has said (more than once): "Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, *if ever*, second guess." *Waters*, 46 F.3d at 1512 (emphasis added).

Detective Murray testified credibly that Detective Carr never threatened German, Transcript at 49; that German never indicated any desire to stop talking, *id* at 55; and that, having knowingly waived his *Miranda* rights, German proceeded to answer all the Detectives' questions cogently and voluntarily, *id*. at 56. Given this testimony, this Court cannot—with 25 years of

38

hindsight—fault German's trial counsel for refusing to call Detective Carr. In fact, counsel's decision was probably the right one. Consider for a moment the options counsel was weighing at the time. On the one hand, he could call Detective Carr who (very likely) would have corroborated everything Detective Murray had already said. Counsel thus would have done little more than allow Detective Carr to—as it were—hammer home the final nail to a coffin Detective Murray had meticulously constructed.

On the other hand, counsel could lie in wait and refuse to call Detective Carr, hoping—sensibly, as it turned out—that the State would want to avoid the possible conflicts that sometimes arise when two witnesses testify about the same thing. German's lawyer would then be free to avail himself of one of the oldest tricks in the defense lawyer's playbook—the empty-chair defense. *See generally* Robert Stier, Jr., *Revisiting the Missing Inference: Quieting the Loud Voice from the Empty Chair*, 44 Md. L. REV. 137, 137 (1985) ("[A] litigant's failure to produce an available witness who might be expected to testify in support of the litigant's case, permits the factfinder to draw the inference that had the witness chair been occupied, the witness would have testified adversely to the litigant."). By relying on the State's burden in criminal cases—and by suggesting that the uncalled Detective had coerced German's confession—counsel might have pulled off an unexpected victory by convincing the jurors to draw the following (very) natural inference: if the State *truly* believed in Detective Carr's story, he could now say, they would have called him; that they did not—he was now free to submit—was ineluctable proof of the State's own misgivings about the voluntariness (perhaps even the verity) of German's purported confession. German's lawyer, in short, made a difficult strategic decision in the face of a complex trial problem—a decision that, correct or not, this Court is not at liberty to second-guess. *See*

39

*Waters*, 46 F.3d at 1512 ("Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess."); *Ward*, 592 F.3d at 1164 ("Moreover, counsel cannot be adjudged incompetent for performing in a particular way in a case, as long as the approach taken might be considered sound trial strategy." (internal citations omitted)).

German has failed to show that Claim Three has *any* merit—let alone the kind of "substantial" merit that would excuse his procedural default. *See Martinez*, 566 U.S. at 17–19. Claim Three is therefore **DISMISSED**.

### c.  Claim Four: Deposing or Calling "Denise"

In Claim Four, German criticizes his trial counsel for failing to depose or call Detective Murray's secretary, "Denise," who transcribed the notes of German's confession. *See* Pet. at 15. Again, because German did not raise this claim in his first collateral proceeding, *see* 2001 Rule 3.850 Motion [ECF No. 12-1] at 107, it is unexhausted and procedurally barred unless German can show some excuse.

At the suppression hearing, Detective Murray testified that the Detectives read German his *Miranda* rights, that German signed a *Miranda* waiver, that he agreed to speak with the Detectives, that he declined the Detectives' request to record the statement, that (during the interview) Detective Murray took notes, and that (days after the interview), "Denise"—Detective Murray did not remember her last name—typed up Murray's notes into a formal report. *See* Transcript at 36–66.

German argues that his lawyer should have called "Denise," and that his failure to do so "allowed the State to parade the arsenal of unsupported testimony surrounding the alleged

40

confession to the Court and the jury unimpeded, unrebutted, and un-impeached." Memo at 12. In fact, German says, "provided the secretary in fact did exist, and any part of the testimony elicited from her through trial counsel's investigation, deposing her, or calling her as a witness could have been used to rebut or impeach the testimony of Detective Murray, petitioner's assertions that he never gave a statement would have had credibility, and the results of the proceedings would have been different[,] probably resulting in an acquittal." *Id.*

German's arguments are unpersuasive. Again, the Eleventh Circuit has instructed district courts to defer to trial counsel's strategic decisions. *See Waters*, 46 F.3d at 1512. "Given the finite resources of time and money that face a defense attorney, it simply is not realistic to expect counsel to investigate substantially all plausible lines of defense. A reasonably competent attorney often *must* rely on his own experience and judgment, without the benefit of a substantial investigation, when deciding whether or not to forgo a particular line of defense. Consequently, counsel has rendered effective assistance even though he decided not to pursue a particular line of defense without substantial investigation so long as the decision was reasonable under the circumstances." *Gates v. Zant*, 863 F.2d 1492, 1498 (11th Cir. 1989).

Counsel's decision not to call "Denise" appears reasonable in the circumstances, because her testimony would very likely have been irrelevant. Denise, after all, was not present for German's interview and only typed up Detective Murray's notes some days later. *See* Transcript at 36–66. And so, even if Detective Murray had, through his notes, fabricated the entire statement—even if German had *never made any statement at all*—Denise would have been unable to corroborate German's account. Denise, after all, was not present for the interview and thus could not have testified about what did (or did not) transpire there. Trial counsel need not investigate

41

every rabbit hole—let alone the empty ones. *See Hittson*, 759 F.3d at 1267 ("Investigation (even a nonexhaustive, preliminary investigation) is not required for counsel reasonably to decline to investigate a line of defense thoroughly.").

German's Fourth Claim, put simply, is meritless, it is in-"substantial," and it cannot excuse his procedural default. *See Martinez*, 566 U.S. at 17–19. It is, therefore, **DISMISSED**.

### d.   Claim Eleven: *Miranda*

In his Eleventh Claim, German says that his trial counsel was ineffective for not challenging the adequacy of the *Miranda* warnings he was given. *See* Memo at 17. Specifically, German alleges that the Detectives told him only that he had a right to "an attorney *before* questioning"—but did not advise him of his right to "an attorney *during* questioning." *Id.* (emphasis added). Again, because German did not raise this Claim in his first collateral proceeding, *see* 2001 Rule 3.850 Motion [ECF No. 12-1] at 107, it is unexhausted and procedurally barred unless German can marshal some viable excuse. As with so many of German's claims, however, his counsel cannot be faulted for failing to advance meritless objections. *See Nyhuis*, 211 F.3d at 1344 ("[C]ounsel is not ineffective for failing to raise claims 'reasonably considered to be without merit.'").

*Miranda* requires no special incantation. *See Florida v. Powell*, 559 U.S. 50, 60 (2010) ("The inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by *Miranda*." (cleaned up)). In *Powell*, the officers had told the defendant that he had "the right to talk to a lawyer before answering any of their questions." *Id.* at 61–62. The Florida Supreme Court vacated Powell's conviction after concluding that, by advising Powell of his right to have counsel *before* questioning, the officers had implied that Powell had no such right *during* the interview—

42

an implication that, in the Florida court's view, violated the spirit of *Miranda*. *Id*. at 63. The United States Supreme Court reversed. The word "before," the Court held, "merely conveyed when Powell's right to an attorney became effective." *Id.* at 62. But the officers' use of "before" did not suggest that, once the questioning had begun, Powell's lawyer would have had to leave the interview room—an inference the Court found far-fetched. As the Court reasoned:

> To reach the opposite conclusion, *i.e.*, that the attorney would not be present throughout the interrogation, the suspect would have to imagine an unlikely scenario: To consult counsel, he would be obliged to exit and reenter the interrogation room between each query. A reasonable suspect in a custodial setting who has just been read his rights, we believe, would not come to the counterintuitive conclusion that he is obligated, or allowed, to hop in and out of the holding area to seek his attorney's advice. Instead, the suspect would likely assume that he must stay put in the interrogation room and that his lawyer would be there with him the entire time.

*Id*. at 62–63. The Supreme Court, in short, has rejected the very argument German says his lawyer should have made in this case.

Because German's *Miranda* objection would have been meritless, his contention that trial counsel should have raised it is not a "substantial" one; it thus does not excuse his procedural default. *See Martinez*, 566 U.S. at 17–19. Claim Eleven, in sum, is **DISMISSED**.

### e.  Claim Fourteen: Rebuttal Closing Argument

In Claim Fourteen, German argues that his trial counsel was ineffective for allowing the State to make a rebuttal closing argument to the jury. *See* Pet. at 29. But, while German supported his Claim with legal citations, *see* Memo at 19, he later abandoned it in his Reply. *See* Reply [ECF No. 14] at 6 ("[I]t appears that the Respondent is correct, that the defense in fact did get the final closing argument.").

German now objects to the Report's conclusion that he abandoned Claim Fourteen. Obj. at 4. But German has already conceded that his lawyer got the final say before the jury. *See* Reply at 6. And he was right—because, in fact, that is what happened. *See* Transcript at 755–67 (showing that it was German's lawyer, not the State's, who gave the final closing argument). German's lawyer cannot be faulted for failing to object to something that—even German now agrees—never transpired. Claim Fourteen is therefore **DISMISSED**.

### f.   Claims Five, Six, Ten, Twelve, and Fifteen

*Martinez* only excuses defaulted claims of ineffective assistance of *trial* counsel. *See Martinez*, 566 U.S. at 17–19. For all other defaulted claims, a habeas petitioner must point to "some objective factor external to the defense that impeded counsel's efforts to comply with the State's procedural rule." *Murray*, 477 U.S. at 488. In Claims Five, Six, Ten, Twelve, and Fifteen, German does not assert that his trial counsel was ineffective. Instead, in those Claims, German alleges that the trial *court* erred.[15] *Martinez* thus cannot help German as to these Claims. And, because German points to no other excuse to justify his procedural default on these Claims,[16] *see* Obj. at 2, they are all **DISMISSED**.

---

[15] Claim Five challenges the court's decision to admit the confession; Claim Six attacks the court's decision to admit certain hearsay statements; Claim Ten alleges that the court was vindictive towards German; Claim Twelve avers that the court erred in its jury instructions; and Claim Fifteen advances a charge of cumulative error. *See* Pet. at 17–18, 24, 26, 28.

[16] German, for instance, could have argued, that he is "actually innocent." *Cf. McKay v. United States*, 657 F.3d 1190, 1196 (11th Cir. 2011) ("Under the actual innocence exception—as interpreted by current Supreme Court doctrine—a movant's procedural default is excused if he can show that he is actually innocent either of the crime of conviction or, in the capital sentencing context, of the sentence itself."). German, however, has made no such claim. Indeed, he failed to object to the Report's conclusion that the "actual innocence" exception does not apply to him. *See* Obj. at 1–2. The Court can find no clear error there.

## II.     The Exhausted Claims: Two, Seven, Eight, Nine, and Thirteen

## A.     Claim Two: Newly Discovered Evidence

In Claim Two, German criticizes the trial court, which denied his 2004 Rule 3.850 motion, for (1) not holding an evidentiary hearing on what he says was newly discovered evidence of Detective Carr's misconduct and (2) concluding that German's newly discovered evidence claim was time-barred under state law. *See* Memo at 9 ("The Trial Court's Use of An Inadequate Procedure for Deciding the Threshold Question in Petitioner's Newly Discovered Evidence *Brady* Claims Resulted in A Decision that was Based on an Unreasonable Determination of the Facts in Light of the Evidence Presented in the Body of the Motion and Denied Petitioner His Right to a Full and Fair Hearing[.]"). The Report recommended that Claim Two be denied because "[d]enial of an evidentiary hearing in state court is not cognizable in a federal habeas proceeding." Report at 23 (cleaned up). German objects. In his view, the state court's finding that his 2004 Rule 3.850 motion was untimely constitutes "an unreasonable determination of the facts" in violation of § 2254(d)(2). Obj. at 4–5. German is mistaken.

As an initial matter, the Report is correct that "the failure of a state post-conviction court to conduct an evidentiary hearing is not a ground of federal habeas relief." *Anderson v. Sec'y for Dept. of Corr.*, 462 F.3d 1319, 1331 (11th Cir. 2006). To the extent, therefore, that German's Claim Two is premised on the state court's unwillingness to hold an evidentiary hearing, the Claim fails.

On the merits, though, the Claim fares no better. In essence, German's Claim Two hinges on a July 28, 2002 Miami Herald article, in which Detective Carr was accused of threatening *other* suspects with violence. *See* 2004 Rule 3.850 Motion [ECF 12-1] at 213, 215, 219. These

45

accusations apparently culminated in a September 9, 2002 decision from this Court, in which Judge Graham found that the petitioner in that case had established his "actual[] innocen[ce]," which "opens the gateway for the Court to hear [his] procedurally defaulted claims." *Brown v. Singletary*, 229 F. Supp. 2d 1345, 1366 (S.D. Fla. 2002). Judge Graham grounded his holding in some "newly discovered evidence"—namely that "an individual named Andrew Johnson ('Johnson') had implicated himself in the murder in statements to undercover officers and a confidential informant." *Id.* at 1351. In so finding, Judge Graham did note (if parenthetically) that, "[a]lthough this phase of the case is not related to Petitioner's confession, and whether it was knowing and voluntary, it is interesting to note that both Petitioner and King gave their statements to Detectives Carr and Thomasevich. Both Petitioner and King claim to have been physically assaulted before giving their statements and to have been shackled to the ground." *Id.* at 1364. Note, though, Judge Graham's conclusion: "without an evidentiary hearing on these issues [relating to Detective Carr], the Court is not in a position to determine the truth or falsity of these allegations." *Id*. Ultimately, then, Judge Graham decided "to defer hearing Petitioner's procedurally barred claims and allow Petitioner to return to state court to pursue both his substantive actual innocence claim and his potential new *Brady* claim." *Id*.

Rule 3.850 requires Florida prisoners to bring their claims of newly discovered evidence within two years "of the time the new facts were or could have been discovered with the exercise of due diligence." By his own admission, German did not file his 2004 Rule 3.850 motion—in which he advanced his arguments about Detective Carr—until October 19, 2004, more than two

years after the publication of the facts on which it was premised.[17] *See* 2004 Rule 3.850 Motion [ECF No. 12-1] at 211. Far from establishing, then, that the state court engaged in "an unreasonable determination of the facts,"[18] the record suggests that the state court was right: German's Rule 3.850 motion *was* time-barred. Claim Two is thus **DISMISSED**.

### B.   Claim Seven: Peremptory Challenges

In Claim Seven, German criticizes his trial counsel for (1) miscounting the number of peremptory strikes he had used and (2) refusing the judge's offer to give him more. *See* Pet. at 19. Towards the end of voir dire, the judge—who (mistakenly) believed that German had exercised all ten of his peremptories when, in fact, he had used only nine—offered German some additional challenges. Obj. at 6. But German's lawyer—who likewise believed that he had used all ten strikes—declined the offer. *Id*. The trial court that denied German's 2001 Rule 3.850 motion concluded that counsel's performance was not deficient. *See* Report at 30–31. The Report, for its part, determined that this conclusion by the state court was not "contrary to," and did not "involve[] an unreasonable application of[,] clearly established Federal law." *Id*. German objects and contends that, "had counsel known that he had used only nine of the ten allotted challenges, then he would not have requested additional ones." Obj. at 6.

When a habeas petitioner challenges a state court's determination of a previously raised claim of ineffective assistance of counsel, "[t]he question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that

---

[17] N.B. This is true whether the premised fact was the July 2002 Herald article or the September 2002 decision by Judge Graham.
[18] 28 U.S.C. § 2245(d)(2).

determination was unreasonable—a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (cleaned up); *see also id.* ("And, because *Strickland*'s is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard."). "The [*Strickland*] test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial[.]" *Waters*, 46 F.3d at 1512. When it comes to trial counsel's decisions during voir dire, federal habeas courts must "defer to trial counsel's performance and eschew the distorting effects of hindsight." *Harvey v. Warden, Union Corr. Inst.*, 629 F.3d 1228, 1247 (11th Cir. 2011).

In denying German's 2001 Rule 3.850 motion, the state court adopted the state's response as its own opinion. *See* Order Denying 2001 Rule 3.850 Motion [ECF No. 12-1] at 203. In that response, the State pointed out that, "before exercising a single strike, counsel secured a promise from German that the Defendant would 'speak out' if there was any disagreement about the jurors as selected." *Id.* at 147. The State was right. The salient exchange went like this:

| Mr. Cohen: | It is now ten after five, Darryl. You and I have been back there going over this for about a half an hour; is the correct? |
|---|---|
| The Defendant: | Not that long. |
| Mr. Cohen: | About twenty minutes or so. We went back there quarter of. We went over all the numbers from one to fifty together. |
| The Defendant: | Yes. |
| Mr. Cohen: | We talked about the jurors and who you like and who you don't like. |
| The Defendant: | Yes. |

| Mr. Cohen: | And, if at any time I'm up here I say something different that [sic] we discuss [sic], you'll speak out? |
|---|---|
| The Defendant: | Yes. |

Opinion Denying 2001 Rule 3.850 Motion [ECF No. 12-1] at 147.

The state court further found that "German was more than an active participant in the selection process." *Id*. at 143. The court held that "[c]ounsel allowed the Defendant to have final say if there was any disagreement during the selection." *Id.* at 143–44. In fact, before agreeing to the jury, German's defense counsel conferred with German and, based on German's input, struck one of the (previously selected) jurors. *See id*. at 168. The conferral—and subsequent strike—proceeded this way:

| The Court: | Defense, do we have a jury? |
|---|---|
| Mr. Cohen: | If I could have a moment to confer with my client? |
| [Pause in proceedings.] | |
| Mr. Cohen: | Strike twenty-one, Judge. |

*Id*. Finally, the state court concluded that "the Defendant remained silent as his counsel 'passed' on opportunities to strike each of the jurors he now complains about in favor of striking other individuals." *Id*. at 144.

Because German challenges exactly none of these facts, this Court must presume their truth. *See* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."). Given this

presumption, German has not established that the state court's determination was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods*, 575 U.S. at 316. German's lawyer conferred with him during voir dire; German, in fact, agreed that he would "speak out" if he objected to his lawyer's selections; and, when (on one occasion) he disagreed with his counsel's choices, German insisted on a different course. And yet, despite all this, German never objected to counsel's decision not to accept additional strikes. This silence strongly suggests that German acceded to this strategic decision precisely because he was satisfied with the jurors his lawyer had selected. But, to the extent German's point is that the record is (at best) ambiguous about his accession, it is important to remember that "an ambiguous or silent record is not sufficient to disprove the strong and continuing presumption [of counsel's competency]. Therefore, where the record is incomplete or unclear about counsel's actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment." *Chandler*, 218 F.3d at 1315 n.15 (11th Cir. 2000).

In any case, German has failed to establish that the lack of a tenth strike prejudiced him in any way. *Strickland*, 466 U.S. at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."). He has not, for instance, pointed to a *single* juror against whom he would have levied this tenth strike. Nor has he even attempted to show that the removal of that one mystery juror—and his or her replacement by the next juror in line (whoever that might have been)—would have made any difference at all. Nor could he. The jury, after all, was composed of twelve human beings, each of whom—after hearing all the evidence—voted to convict German. And German does not explain why replacing any one of these twelve with an alternate juror would have altered

this unanimous result. *Cf. Miller v. United States*, 562 F. App'x 838, 845 (11th Cir. 2014) ("Miller cannot show that failing to strike the juror undermined confidence in the trial's outcome. Accordingly, the failure to strike the juror was simply insufficient to prejudice the outcome of the trial."); *Babb v. Crosby*, 197 F. App'x 885, 887 (11th Cir. 2006) ("[T]he Supreme Court has not concluded that a lawyer who leaves an arguably biased juror on a jury is *per se* ineffective.").

Claim Seven is, for all these reasons, **DISMISSED**.

### C.    Claim Eight: Naming the Co-Defendants in the Jury Instructions

German next chastises the trial court for naming his co-defendants in the jury instructions. *See* Pet. at 20–21. The Report concluded that any error in the jury instructions was an error of state law and, thus, not cognizable here. *See* Report at 32–33. German objects. Although he concedes that jury-instruction errors are not typically subject to federal review, he insists that "[t]his practice is unprecedented in that, it had never been done in any Florida Court, which rendered the entire trial fundamentally unfair." Obj. at 7.

Generally speaking, the "fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle*, 502 U.S. at 71–72. The Supreme Court, however, has carved out an exception to this rule for cases in which "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). In deciding whether the challenged instruction "infected" the entire trial, "the habeas court should consider the context of the instructions as a whole as well as the entire trial record." *Parker v. Sec'y for Dept. of Corr.*, 331 F.3d 764, 779 (11th Cir. 2003). In reviewing a challenged jury instruction, this Court must assess "whether there is a reasonable

likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *Estelle*, 502 U.S. at 72.[19]

German advances two arguments in support of his position that naming his co-defendants "infected" his entire trial. *First*, he says that the trial court's decision to name his co-defendants was "unprecedented." Obj. at 7. *Second*, he contends that placing him alongside two other criminals made it "impossible for the jury to distinguish evidence admitted against petitioner and the co-defendants, or apply the law regarding his guilt or innocence individually." Memo at 18. Both arguments fail.

On the first, German cites no case or rule for the proposition that a state court violates due process whenever it uses a jury instruction that has never been used before. *See* Obj. at 7. Trial judges must tailor their jury instructions to the specific circumstances of each case—a laborious, fact-intensive process that often requires judges to try new things. Trial judges thus *routinely* cobble together instructions—or craft new ones—in ways that help the jury understand the law and apply it to the facts. Nothing about this violates the Due Process Clause. *See United States v. Veltmann*, 6 F.3d 1483, 1492 (11th Cir. 1993) ("We have on countless occasions approved jury instructions which did not exactly track pattern language."); *Kaplan v. Daimlerchrysler, A.G.*, 2003 WL 22023315, at *4 (11th Cir. 2003) ("[T]he absence of such an instruction in Florida's standard jury instructions does not render the instruction improper. Judges are not restricted to standard jury instructions in formulating and giving jury instructions."); *Jennings v.*

---

[19] N.B., "an omission, or incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Estelle*, 502 U.S. at 72 (citing *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)).

*BIC Corp.*, 181 F.3d 1250, 1254 (11th Cir. 1999) ("If the instructions accurately reflect the law, the trial judge is given wide discretion as to the style and wording employed in the instruction.").

Anyway, there was nothing "unprecedented" about naming co-defendants in a jury instruction. *Cf. Puiatti v. McNeil*, 626 F.3d 1283, 1316 (11th Cir. 2010) ("The Supreme Court has held that co-defendants do not suffer prejudice simply because one co-defendant's defense directly inculpates another, or it is logically impossible for a jury to believe both co-defendants' defenses." (internal citations omitted)); *Garzon v. State*, 980 So.2d 1038, 1043 (Fla. 2008) ("If the law of principals applies to a defendant's conduct, that defendant can properly be convicted for a codefendant's criminal acts," and so, "[w]e agree that the use of 'and/or' in this case did not result in fundamental error."). The trial judge's decision to include the names of German's co-defendants in the jury instructions was thus not (even remotely) erroneous.

And, even if it had been, the Florida Supreme Court has emphasized that individual verdict forms—like the one at issue here, *see* Verdict Forms [ECF No. 12-1] at 21–23—can cure otherwise misleading instructions. *See Garzon*, 980 So.2d at 1044 ("[T]he verdict forms focused on one defendant and one crime each. The jury therefore had before it individualized jury forms that further reinforced the individualized consideration each defendant was to receive. Working in tandem, the instructions and verdict forms strongly emphasized to the jury that each defendant was to receive an individualized consideration.").

German's second argument merits little discussion. The trial court properly instructed the jurors that "Brenda Babrow and Eric Anderson are not for your consideration. Solely the verdict you will render will be as to Daryl German." Transcript at 145. And, as the Eleventh Circuit has said many times, we must "presume juries follow their instructions." *United States v. Roy*, 855

F.3d 1133, 1187 (11th Cir. 2017). German provides nothing but baseless speculation for his view that the jurors ignored their oaths and disregarded the court's instructions.

Either way, as the State pointed out in its response to German's direct appeal, the conduct of German's co-defendants was directly relevant to the charges in German's case. The State, after all, argued at trial that German was a principal under either of two alternate theories of liability: premeditated murder and felony murder. *See* State's Response to Direct Appeal Opening Brief [ECF No. 12-1] at 98. And, the State argued, the jury could find German guilty as a principal (applying either theory) because, under Florida law, "one who participates with another in a common criminal scheme is guilty of all crimes committed in furtherance of that scheme regardless of whether he or she physically participates in that crime." *Jacobs v. State*, 396 So.2d 713, 716 (Fla. 1981); *Staten v. State*, 519 So.2d 622, 624 (Fla. 1988) ("Under our law, both the actor and those who aid and abet in the commission of a crime are principals in the first degree. In order to be guilty as a principal for a crime physically committed by another, one must intend that the crime be committed and do some act to assist the other person in actually committing the crime." (internal citations omitted)). The jury was thus required to consider the conduct of German's co-defendant's—together with the question of German's participation, if any, "in a common criminal scheme"—in deciding German's fate. Naming those co-defendants so that the jurors could easily identify the acts of each participant in the scheme and then decide whether (and to what extent) German should be held responsible for those acts was thus sensible and proper.

Finally, even if the trial court had erred by including the names of German's co-defendants in the jury instructions, there's no reason to believe that this error prejudiced him in any way. During several days of trial, the co-defendants' names were repeatedly invoked—all without any

objection from German. *See, e.g.*, Transcript [ECF No. 13-1] at 144, 147, 148, 150, 369, 530, 532, 698.  In fact, German's counsel invoked their names in both his opening statement and his closing arguments. *Id*. at 152, 155, 157, 702, 706, 708. And, at closing, German's lawyer (correctly) implored the jurors that "[y]ou don't know what happens to the other two. You're not supposed to take that into consideration. You're not supposed to guess or speculate what happened to the other two." *Id.* at 695–96.

 German never explains how he could have been prejudiced by the judge's repetition of two names the jurors had heard many times already. More fundamentally, the jury heard and saw, over several days, graphic evidence of the victim's murder. To think that their ability to listen to the evidence—and to follow the court's instructions—was inhibited, not by this gruesome evidence, but by the judge's innocuous incantation of the co-defendants' names, strains credulity.

 But, even if German *could* show prejudice, he cannot establish that the court's error "infected the entire trial" with unfairness. German was assisted throughout trial by competent counsel who ably cross-examined the State's witnesses and repeatedly called into question much of the State's evidence. *See, e.g.*, Transcript at 191–225 (voir dire and cross-examination of the victim's neighbor); *id.* at 239–41 (cross-examination of second neighbor); *id.* at 263–69 (cross-examination of medical expert); *id.* at 542–82 (cross-examination of Detective Murray); *id.* at 593–614 (re-cross of Detective Murray). German was afforded the opportunity to call his own witnesses, to present his own evidence, and to testify in his own defense—opportunities he, for his own reasons, refused.[20] *Id.* at 749:2. And German's counsel gave the jury an impassioned closing

---

[20] Much more on this below.

argument—in which he specifically addressed the co-defendants' inclusion in the jury instructions and compellingly urged the jurors not to hold the co-defendants' conduct against German. *Id.* at 695. The inclusion of German's co-defendants' names in the jury instructions thus did not "infect" an otherwise fair (if imperfect) trial.

German's Claim Eight is therefore **DISMISSED**.

### D. Claim Nine: Trial Counsel's Threat to Abandon German if he Testified

German's Ninth Claim is that he was denied effective assistance of counsel because his defense attorney threatened to abandon him if he testified and because the trial court scared German out of testifying. Memo. at 22. The Report did not address this second aspect of Claim Nine—which German now characterizes as his "smoking gun." Obj. at 7. But this aspect of Claim Nine is not, as German's Petition suggests, a claim of ineffective assistance of counsel. Pet. at 22. It is, rather, a critique of the *judge's* right-to-testify/right-to-remain-silent colloquy, which German never presented to the state courts. And, since German provides no excuse for his failure to exhaust this now-procedurally-barred claim (*see* Pet. at 22; Obj. at 7), this Court cannot consider it. *See Coleman*, 501 U.S. at 750 ("In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.").

In the second part of Claim Nine, German says that, after he changed his mind about testifying, his lawyer took him aside and threatened to abandon his defense if German took the stand. *See* Pet. at 22. German did present this claim to the Florida state courts in his 2001 Rule

3.850 motion. *See* [ECF No. 12-1] at 126. But the state court rejected it and adopted the State's response as its opinion. *See* Order Denying 2001 Rule 3.850 Motion [ECF No. 12-1] at 203. In the state court's view, "there is no factual description of the testimony the defendant would have offered upon which this Court can find any prejudice." Opinion Denying 2001 Rule 3.850 Motion [ECF No. 12-1] at 144.

"A claim that a defendant's right to testify was violated by defense counsel is analyzed as a claim of ineffective assistance of counsel." *Topete v. United States*, 628 F. App'x 1028, 1029 (11th Cir. 2015) (citing *United States v. Teague*, 953 F.2d 1525, 1534 (11th Cir. 1992)). Again, when a habeas petitioner challenges a state court's denial of a previously-raised claim of ineffective assistance of counsel, "[t]he question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles*, 556 U.S. at 123. For "a state court's application of [Supreme Court] precedent" to be "'unreasonable, the state court's decision must have been more than incorrect or erroneous. The state court's application must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520–21 (cleaned up).

This Court agrees with the state court's resolution of this issue for four reasons.

*First*, German has not shown—as he was required to—that counsel's (alleged) interference with his right to testify caused him any prejudice. *See Teague*, 953 F.2d at 1535 ("[T]he defendant must show that the deficient performance prejudiced the defense."). Prejudice means that there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

In the "Prejudice" section of his 2001 Rule 3.850 motion, German argued that, "if the jury would have been presented with the testimony of the defendant, the line of questioning the defendant wanted counsel to pursue, the jury would have been presented with the 'total picture', [sic] both sided [sic] of the story in other words, for the jury to use in their deliberative process, the possibilities are very high, the defendant would have been acquitted." 2001 Rule 3.850 Motion [ECF No 12-1] at 134. To reiterate: the state court rejected this claim because German failed to submit some (even cursory) recitation of what his testimony would have been. And this makes sense. How can we know whether his testimony would have been as persuasive as he now claims— so compelling, in fact, that it would have impelled twelve people who voted to convict him to change their minds and acquit—without knowing what he would have said?

Whether it makes sense or not, though, German has cited no case—not in his Petition, nor in his Memorandum of Law, nor even in his Objections—for the proposition that the state court's decision was "contrary to" federal law. *See generally* Pet. at 22; Memo at 19; Obj. at 7. And, indeed, this Court has found no case that would support German's view that, in adjudicating an interference-with-the-right-to-testify claim, a state court is prohibited from demanding to hear what the proposed testimony would have been. To the contrary, federal habeas courts regularly permit state courts to require some showing of what the petitioner would have said. *See, e.g.*, *Vega-Encarnacion v. United States*, 993 F.2d 1531, 1535 (1st Cir. 1993) ("What is lacking, obviously, is any indication of exactly what appellant's testimony would have been. . . . In the absence of this kind of specificity, it is impossible to determine that, but for counsel's alleged errors, the result below would have been different."); *Marquez v. United States*, 2013 WL 12336140, at *33 (S.D. Fla. June 17, 2013) ("Here, Marquez makes no mention of what he would have testified to that

would have altered the result of his case. Thus, Marquez fails to satisfy the second prong of *Strickland.*"); *Turman v Jones*, 2017 WL 2222380, at *18 (N.D. Fla. Apr. 17, 2017) ("Petitioner's general assertion that he would have refuted Katie's testimony and testified as to his own version of events is insufficient to show a reasonable probability the jury would have discredited not only Katie's testimony, but Scott Wilson's testimony, if Petitioner had testified."); *Lee v. Thomas*, 2012 WL 1965608, at *37 (S.D. Ala. May 30, 2012) ("[Petitioner] does not say what testimony he would have provided. He makes no showing that his testimony would have mattered at all for purposes of mitigation. Given these glaring infirmities in petitioner's showing under the prejudice prong of the *Strickland* analysis, the Court finds no error in the Alabama courts' resolution of this issue in Lee's Rule 32 petition.").

*Second*, German never addresses the reality that—had he testified—he would have been impeached with his *seven* prior convictions for "felon[ies] or crimes involving dishonesty or perjury." Transcript at 618. Because German did not testify, the jury never heard about any of these prior misdeeds. In other words, without knowing what German would have said, the Court can be sure of only one thing with respect to his proposed testimony: it likely would have redounded very much to his detriment. *Cf. Pericles v. United States*, 567 F. App'x 776, 784 (11th Cir. 2014) ("In fact, Pericles's testimony could have even hurt his case. . . . If Pericles had testified, the government undoubtedly would have cross-examined him about the five state *felony* convictions he sustained over an eight-year criminal career. The jury's impression of Pericles would likely have been unfavorable." (internal citations omitted)).

*Third,* German's only "proof" of his claim that his trial counsel threatened to abandon him is the following comment from the trial judge: "The Court: Well I think you have a duty to

represent your client throughout the trial and for me to say, no, I don't want you to participate, I think that would be inviting error on a reversible." Transcript at 742–43. The state court found that this comment did not support German's allegations, *see* Opinion Denying 2001 Rule 3.850 Motion [ECF No. 12-1] at 144, and a careful review of the record confirms this conclusion.

German, in fact, grossly distorts the trial court's comment, which must be read in context. Because the court had allowed German to change his mind—to testify after he had initially chosen not to—it had to grapple with the fact that the lawyers had *already* given their closing arguments. Recognizing the awkwardness of this procedure, the prosecutor (Loe) asked the court for permission to argue that German had known about his right to testify *before* closings—the implication being that German had cleverly waited until *after* the prosecutor's closing precisely so that he could hear what the prosecutor had to say and, in his subsequent testimony, rebut it. With the prosecutor and the court going back and forth on what (if anything) the jurors should be told about all this, defense counsel interjected and asked for permission to "participate in" the discussion, which led the court to make the comment on which German's Claim now hinges. The whole exchange went like this:

| | |
|---|---|
| The Court: | But my feeling is that the whole purpose of this procedure is to try to arrive at a total picture of what happened and if that can be done better by overlooking certain procedural requirements, such as how allowing a defendant at this time prior to the jury deliberating to hear from him, I think that is important. Now, let me say one other thing that the defendant should consider. Your attorney has made an excellent closing argument. It is conceivable that the jury has a reasonable doubt; and by your testifying, that you are going to eliminate that reasonable doubt. Do you understand that? |
| Mr. Cohen: [sic] | Yes. |
| The Court: | Do you still wish to proceed? |

| | |
|---|---|
| The Defendant: | Yes. |
| The Court: | Now, what instruction, if any do the parties want me to give to the jury with reference as to what happened? What I suggest is that even though the parties have rested, that the defendant has requested that he be permitted to testify, and that I will permit it. Is there any objection to that instruction? |
| Mr. Loe: | No. He previously told the Court, in no uncertain terms, that he did not wish to testify. He wished to exercise his right to remain silent because he's had the advise [sic] of counsel, had the Court's colloquy and inquiry. I would ask the Court's permission to be able to go into that because now he has heard my closing argument. I don't know what he's going to say. I would like the jury to know he previously had an opportunity. He declined that, Judge. You've been practicing law for 30 years. You've never heard of it. I've never heard of this. I've never even read a case on this. So it's definitely a case of first impressions. And if he wants to stick it to me by listening to my closing arguments, how I sum up the evidence and get up there and say, well let me explain this, this, this and this and that's why it's not true and not the way the State said it. I think the jury should at least have an understanding that he had an opportunity to do it before. He didn't want to do it then and he only wants to do it now that I've given my closing. It goes to his motive for his testifying at this juncture. |
| The Court: | All right. Since he has an absolute right to either testify or not testify, his motive for wanting to testify at this point would be irrelevant as it relates to his guilt or innocence. In other words, I don't want there to be a comment any more on his right to remain silent than on his right to testify. |
| Mr. Loe: | I'm with you on that, but you know me, you've seen me practice law. You've seen me try cases. I don't tie it up. |
| Mr. Cohen: | Can I ask the Court one question for my own direction? I'm going to ask you for direction on this. Is there argument you would you [sic] like my participation in or you won't – |
| The Court: | All of a sudden you're asking whether I want your participation. |
| Mr. Cohen: | I know I've been strong from all the others but I need – |

61

**The Court:**   **Well, I think you have a duty to represent your client throughout the trial and for me to say, no I don't want you to participate, I think would be inviting error on a reversible.**

Mr. Cohen:    I guess what I'm saying, if you think there is something between the State and you.

The Court:    No, it's not between the State and me. You are a party here and I'm not really inclined to allow the State to comment about what procedures are because the jury is going to decide based on facts. And for either side to comment that, well, the defendant is really trying to snooker me here by waiting until I make the arguments and then testify, I don't see how it's going to assist the jury and it's surely not any of the weighing of the evidence requirements that's in the instruction. And I don't see where it helps the decider of facts.

Mr. Loe:    He got to hear my closing of closely guarded secrets. That's my work product. I don't share that with anyone, and I have shared it with him. And now he is going to get up. I feel –

The Court:    I'll permit you to address any additional portion based on what he says. You will have an opportunity to address it. The whole purpose of this is to gather the truth.

Mr. Loe:    I'm with you, believe me.

The Court:    Not to say that the defendant is a bad guy because he didn't follow procedure. And if I allow you to comment on that, then that's basically what you argue and you're saying this guy is really a bad guy because he didn't follow the rules of criminal procedure.

Mr Loe:    That's not my argument. My argument –

The Court:    That's the way it would be interpreted. And I'm instructing you not to do it.

Mr. Loe:    Fine.

*Id.* at 740:6–45:11. The "participation" to which the court referred, in other words, was counsel's

participation in the discussion about what, if anything, the jury should be told—and not, as German

insists here, his participation in German's case *as a whole*.

    *Fourth*, German's claim that his lawyer threatened to abandon him is strongly belied by

the following colloquy with the trial judge (which came after German decided, for a second time,

not to testify):

| | |
|---|---|
| Mr. Cohen: | I've had sufficient time to discuss it with Daryl German, and I would indicate that just my final statement to him was, from this point on, it's between you and the Court. I've given him my advice. He told me now what he thinks he wants to do and I would like him to tell the Court or the Court to make your own inquiry to your satisfaction. |
| The Court: | Mr. German, what would you like to do? |
| The Defendant: | I will not testify. |
| The Court: | Okay. So at this point, the defense is going to give its portion of his sandwich.[21] |
| Mr. Cohen: | Just for clarification Daryl, we talked about it, is that right? |
| The Defendant: | Yes. |
| Mr. Cohen: | I gave you the pros and cons about it, correct? |
| The Defendant: | Yeah. |
| Mr. Cohen: | You were concerned that you felt that certain things that were said that you felt you wanted to answer and I talked to you about what was important and what isn't and what the law is and my job as the attorney, correct? |
| The Defendant: | Yes. |

---

[21] The "sandwich" here refers to the bifurcating of German's closing arguments into two
sections—one before the State's closing and the second after. *See* Transcript at 693.

| | |
|---|---|
| Mr. Cohen: | And did you feel you understood and agreed with the things I said? |
| The Defendant: | Yeah. |
| Mr. Cohen: | Did you feel that if there were small details about this, you'd have an opportunity later on to tell Judge Shapiro? |
| The Defendant: | Yeah. |
| Mr. Cohen: | And you feel now, without question, this is the correct decision? |
| The Defendant: | Yeah. |
| The Court: | All right. You're telling me that it is not going to make a difference as far as whether you're guilty or not guilty. I do not decide whether you're guilty or not guilty. That is solely on the purview of the jury, so if you have anything that bears on whether or not you want to testify that goes to guilt or innocence and they will decide it. In the event they find you guilty, then I have no choice as far as sentence if they find you guilty of murder in the first degree, I'm required by law to sentence you to life with a minimum mandatory sentence of 25. So whether you tell me one thing or two things, I still have to impose the same sentence if they find you guilty. Do you understand that? |
| The Defendant: | Yes. |
| The Court: | So if you want the trier of fact to know something, the only way you can do that is by testifying. If you testify, then you will be subject to cross examination and the State, if it wishes can put on what they call rebuttal evidence to show that what you said was either incorrect or what you said should not be given any weight by the jury. Do you understand that sir? |
| The Defendant: | Yes. |
| The Court: | Do you still wish not to testify, is that correct? |
| The Defendant: | Correct. |
| The Court: | Okay. |

*Id*. at 748:15–51:07.

64

Notably absent from trial counsel's recapitulation of his private discussion with German is any hint of the threat German now says counsel dropped on him. It would be one thing if counsel had made this proffer to the court without any input from German. But, as the transcript makes clear, German—who never suggested that counsel had made any such threat at the time—agreed unequivocally with the substance of counsel's summary. And when the court asked him whether *he* had decided not to testify, he answered "Yes." Indeed, he agreed with counsel that, "without question, this is the correct decision."

In these circumstances, the Court need not conduct an evidentiary hearing to determine whether (and to what extent) German's lawyer threatened him.[22] *See United States v. Jerchower*, 486 F. App'x 68, 70 (11th Cir. 2012) ("A district court's refusal to hold an evidentiary hearing is not an abuse of discretion where the court conducted an extensive plea colloquy."); *see also United States v. Kovasznay*, 675 F. App'x 900, 902–03 (11th Cir. 2017) ("[T]he court did not abuse its discretion in refusing to hold an evidentiary hearing because, as noted above, it conducted a systematic and exhaustive colloquy before accepting the plea."). This principle—that a federal court need not hold an evidentiary hearing when the plea colloquy is clear—applies with equal force to right-to-testify colloquies because "solemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). A habeas petitioner who hopes to redo a decision he made after a colloquy must thus overcome a "formidable barrier"

---

[22] In any case, for the three other reasons discussed in this Section, any such evidentiary hearing would be futile. *See Chavez*, 647 F.2d at 1060 ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief.").

because "indiscriminate hearings in federal postconviction proceedings . . . would eliminate the chief virtues . . .of finality." *Winthrop-Redin v. United States*, 767 F.3d 1210, 1216 (11th Cir. 2014) (cleaned up). In this respect, it is worth remembering that, "more often than not, a prisoner has everything to gain and nothing to lose from filing a collateral attack." *Id.* (citing *Blackledge*, 431 U.S. at 71).

The colloquy here is clear (if not altogether exhaustive) and strongly suggests that German's lawyer never threatened him. In sum, German was advised in open court of his right to testify and voluntarily chose to waive it. He did so after being given multiple opportunities to discuss the matter with his lawyer—a discussion that, German agreed, involved not a threat of abandonment but an analysis of the pros and cons of testifying. Having fairly assessed the cons, German concurred that staying silent was "without question . . . the correct decision." And this choice seems like the sensible one. After all, given his extensive criminal history[23]—a history that his silence managed to keep hidden—his testimony (very likely) would not have gone well.

Claim Nine, in sum, is likewise **DISMISSED**.

### E.  Claim Thirteen: The Judgment of Acquittal

In his Thirteenth Claim, German contends that the trial court erred by denying his motion for acquittal. *See* Pet. at 27. German raised this claim in his direct appeal, in which (again) the Fourth DCA affirmed his conviction and sentence. *See* Direct Appeal Opening Brief [ECF No. 12-1] at 73, 105.

---

[23] Not to mention his refusal (even now) to reveal what he might have said.

The Report recommended denying this Claim because arguments about the sufficiency of the State's evidence are generally not cognizable in a federal habeas proceeding. *See* Report at 35–36. German objects and suggests that this Court "certainly has authority to weigh and consider the Constitutional sufficiency of evidence in a state criminal trial." Obj. at 8. German is partly right. While this Court may not weigh—or (re)weigh—the State's evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Under this standard, the State's evidence was more than sufficient.

German was convicted of second-degree murder with a firearm and armed robbery. Verdict Forms [ECF No. 12-1] at 21–23. Under Florida law, the elements of second-degree murder with a firearm are: "One, [the victim] is dead. Two, the death was caused by the criminal act or agency of [the defendant(s)]. Three, there was an unlawful killing of [the victim] by an act imminently dangerous to another and evincing a depraved mind without regard for human life." Transcript at 776. Finally, the jury must find that "[the defendant] committed murder in the second degree and also find that during the commission of the crime he was in the actual possession of a firearm." *Id*. at 776–77.

And the elements of armed robbery are: "One, [the Defendant] took the money from the person or custody of [the victim]. Two, force, violence, assault or by putting in fear was used in the course of the taking. Three, the property taken was of some value. Four, the taking was with the intent to permanently deprive [the victim] of his right to the property or any benefit from it or

appropriate the property of [the victim] to his own use or the use of any person not entitled to it." *Id*. at 779.

At trial, the victim's neighbors testified that, in his dying declarations, the victim had identified two black males and a redheaded white female as the people who had robbed him. *See* Transcript at 215. And Detective Murray testified that German confessed to the following facts: German and his co-defendants—a black male and a redheaded white female—had surveilled the victim's apartment in anticipation of robbing him, *id*. at 530; German had a gun, which he intended to use during the robbery, *id.* at 531; German and his co-defendants approached the victim's door with the intention of robbing him, *id.* at 532; German pointed his gun at the victim while one of his co-defendants searched the apartment for drugs and money, *id.* at 535; German and his co-defendants, in fact, stole some of the victim's property, including "between two and three hundred dollars," *id.* at 536; and, when the victim tried to overpower German, his co-defendant took the gun and shot the victim in the stomach, *id*. at 537. The victim, it was undisputed, died from that gunshot. *Id*. at 261 ("Mr. Loe: Doctor, based on the elevation [sic] that you did, were you able to determine what the cause of death was for Mr. Cullman? Dr. Michael Bell [the Medical Examiner]: A gunshot wound to the abdomen.").

"[V]iewing the evidence in the light most favorable to the prosecution," a rational trier of fact could have found, as this jury did, that German committed the crimes of armed robbery and second-degree murder with a gun. This is true even though German did not actually shoot the victim because, as we have discussed, "[o]ne who participates with another in a common criminal scheme is guilty of all crimes committed in furtherance of that scheme regardless of whether he or she physically participates in that crime." *Jacobs*, 396 So.2d at 717.

68

German's Claim Thirteen, then, must be **DISMISSED**.

### III.    Evidentiary Hearing

German does not challenge the Report's conclusion that his Petition does not merit an evidentiary hearing. And, because none of German's claims requires further factual development, the Report's determination is not clearly erroneous. *See Chavez*, 647 F.2d at 1060 ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."). German's request for an evidentiary hearing is therefore **DENIED**.

### IV.    Certificate of Appealability

German likewise does not object to the Report's suggestion that his request for a certificate of appealability should be denied. A certificate of appealability should issue only when the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). But where, as here, the district court has rejected the petitioner's claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). By contrast, when a district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

The Report's recommendation is not clearly erroneous. Indeed, as we have seen, German has defaulted on many, if not most, of his claims—and there can be little debate about the merits of his remaining assertions. His request for a certificate of appealability is thus **DENIED**.

***

Accordingly, the Court hereby **ORDERS** and **ADJUDGES** as follows

1. German's Petition [ECF No. 1] is **DENIED**.

2. German's request for a certificate of appealability is **DENIED**.

3. German's request for an evidentiary hearing is **DENIED**.

4. The R&R [ECF No. 19] is **ADOPTED except as to Claim Five.** Having determined that Claim Five was exhausted, the R&R denied that Claim on its merits. But this Court has **DENIED** Claim Five as unexhausted and procedurally defaulted.

5. The Clerk of Court shall **CLOSE** this case.

6. All other pending motions are **DENIED as moot**.

7. All pending deadlines and hearings are **TERMINATED.**

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 27th day of August 2020.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record